**Case No. 22-2163**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

VOICE TECH CORP.,
*Appellant*

v.

UNIFIED PATENTS, LLC,
*Appellee*

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
No. IPR2020-01018

## APPELLANT VOICE TECH CORP.'S
## PRINCIPAL BRIEF

Eric M. Adams
eadams@tumeyllp.com
TUMEY L.L.P.
5177 Richmond Avenue, Suite 1188
Houston, Texas 77056
(713) 622-7005
(713) 622-0220 *fax*

ATTORNEYS FOR APPELLANT
VOICE TECH CORP.

## PATENT CLAIMS AT ISSUE

This appeal concerns claims 1-8 of U.S. Patent No. 10,491,679. These are reproduced below. Emphasis is added to the claim terms at issue.

1. A method of accessing and controlling a computer from a mobile device, comprising:

   receiving audio data from the mobile device, at the computer, at an *audio command interface*;

   the *audio command interface* decodes the audio data into a command;

   the *audio command interface* selects, from at least one operating system and at least one application, one operating system or one application, wherein the *audio command interface* decides is the appropriate operating system or application to execute at least one process in response to the command;

   executing with the selected operating system or application the at least one process in response to the command;

   generating output data in response to the selected operating system or application executing the at least one process; and

   transmitting the output data to the mobile advice.

2. The method of claim 1, wherein the mobile device is not physically connected to the computer and the application selected by the *audio command interface* is installed on the computer.

3. A method of accessing and controlling a computer from a mobile device, comprising:

   receiving audio data from the mobile device, at the computer, at an *audio command interface*;

   the *audio command interface* decodes the audio data into a command;

the *audio command interface* selects, from two or more applications, one application, wherein the *audio command interface* decides is the appropriate application to execute at least one process in response to the command;

executing with the selected application the at least one process in response to the command;

generating output data in response to the selected application executing the at least one process; and

transmitting the output data to the mobile device.

4. The method of claim 3, wherein the mobile device is not physically connected to the computer and the application selected by the *audio command interface* is installed on the computer.

5. A system for accessing and controlling a computer from a mobile device, comprising:

a computer;

a communications medium that couples the mobile device to the computer; and

an *audio command interface*, at the computer, the *audio command interface*:

receives audio data from the mobile device;

decodes the audio data into a command;

selects, from at least one operating system and at least one application, one operating system or one application, wherein the *audio command interface* decides is the appropriate operating system or application to execute at least one process in response to the command;

executes with the selected operating system or application the at least one process at the computer in response to the command; and

generates output data in response to the selected operating system or application executing the at least one process;

wherein a *mobile device interface* at the computer transmits the output data to the mobile device.

6. The system of claim 5, wherein the mobile device is not physically connected to the computer and the application selected by the *audio command interface* is installed on the computer.

7. A system for accessing and controlling a computer from a mobile device, comprising:

a computer;

a communications medium that couples the mobile device to the computer; and

an *audio command interface*, at the computer, the *audio command interface*:

receives audio data from the mobile device;

decodes the audio data into a command;

selects, from two or more applications, one application, wherein the *audio command interface* decides is the appropriate application to execute at least one process in response to the command;

executes with the selected application the at least one process at the computer in response to the command; and

generates output data in response to the selected application executing the at least one process;

wherein a *mobile device interface* at the computer transmits the output data to the mobile device.

8. The system of claim 7, wherein the mobile device is not physically connected to the computer and the application selected by the *audio command interface* is installed on the computer.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-2163

**Short Case Caption** Voice Tech Corp. v. Unified Patents, LLC

**Filing Party/Entity** Appellant Voice Tech Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/16/2022

Signature: /s/ Eric M. Adams

Name: Eric M. Adams

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Voice Tech Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Voice Tech Corp. v. Mycroft AI Inc., Case No. 4:20-cv-00111 (W.D. Mo.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE ii

CERTIFICATE OF INTEREST v

TABLE OF AUTHORITIES x

STATEMENT OF RELATED CASES xii

JURISDICTIONAL STATEMENT 1

STATEMENT OF THE ISSUES 1

STATEMENT OF THE CASE 3

I. WONG AND BEAUREGARD 3

II. THE '679 PATENT 6

III. PROCEDURAL HISTORY 7

SUMMARY OF ARGUMENT 7

ARGUMENT 9

I. THE BOARD'S ERRORS RELATED TO THE "MOBILE DEVICE INTERFACE" 9

A. The Board erred by finding that Unified satisfied its burden to prove that the combination of Wong and Beauregard teaches the MDI limitations in claims 5 and 7 11

1. Unified's Actual Petition Arguments for Claim 5 12

2. Unified's Actual Petition Arguments for Claim 7 14

3. Unified's Actual Petition Arguments for Element [1.6] 15

4. The Board's Arguments Created for Unified 17

5. The Board erred by finding that Unified satisfied its burden of proof ..... 19

B. The Board erred by creating new invalidity arguments for Unified ..... 27

C. The Board erred by overruling Voice Tech's objections to Unified's new Reply arguments ..... 28

II. CLAIM CONSTRUCTION ..... 30

A. Standard of Review ..... 30

B. "Audio Command Interface" ..... 31

C. "Mobile Device Interface" ..... 35

III. CLAIMS 1-8 ARE PATENTABLE IN VIEW OF WONG AND BEAUREGARD ..... 38

A. Standard of Review ..... 39

B. The "Receiving" Elements ..... 39

C. The "Decodes" Elements ..... 45

D. The "Deciding/Selecting" Elements ..... 51

E. Unified Relied on Hindsight Reasoning ..... 56

CONCLUSION ..... 60

SIGNATURE ..... 61

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. MPH Technologies Oy*,
28 F.4th 254 (Fed. Cir. 2022) 30

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) 1, 11, 27, 28, 29

*Choirock Contents Factory Co., Ltd. v. Saucier*,
801 Fed. Appx. 754 (Fed. Cir. Feb. 21, 2020) (nonprecedential) 23, 24, 25

*Co-Steel Raritan, Inc. v. International Trade Com'n*,
357 F.3d 1294 (Fed. Cir. 2004) 60

*Cuozzo Speed Technologies, LLC v. Lee*,
136 S.Ct. 2131 (2016) 11, 27, 60

*Elbit Systems of America, LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) 11, 20, 21, 22

*Fanduel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) 39

*Hester Industries, Inc. v. Stein, Inc.*,
142 F.3d 1472 (Fed. Cir. 1998) 34

*In re Bond*,
910 F.2d 831 (Fed. Cir. 1990) 26

*In re Gleave*,
560 F.3d 1331 (Fed. Cir. 2009) 26

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) passim

*InTouch Technologies, Inc. v. VGO Communications, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) 2, 57, 58, 59

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 36

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) .......... 2, 30

**<u>Statutes</u>**

28 U.S.C. §1295(a)(4)(A) .......... 1

35 U.S.C. §6(b) .......... 1

35 U.S.C. §103 .......... 57

35 U.S.C. §103(a) .......... 7

35 U.S.C. §141(c) .......... 1

35 U.S.C. §142 .......... 1

**<u>Regulations</u>**

37 C.F.R. §90.2(a) .......... 1

## STATEMENT OF RELATED CASES

There were no previous appeals in or from the proceeding below. This Court's decision in the pending appeal will directly affect the following case, which is currently stayed: *Voice Tech Corp. v. Mycroft AI Inc.*, No. 4:20-cv-00111-BP (W.D. Mo.). Further, this Court has noted that the following appeal is to be considered a companion case: *Voice Tech Corp. v. Mycroft AI Inc.*, No. 2023-1033. *See* Docket Entry No. 10.

## JURISDICTIONAL STATEMENT

This case involves an appeal from the Final Written Decision in *inter partes* review No. IPR2020-01018. The Patent Trial and Appeal Board had jurisdiction under 35 U.S.C. §6(b). On December 13, 2021, the Board issued its Final Written Decision. Appx1-50. On January 12, 2022, Appellant Voice Tech Corporation filed a Request for Rehearing, Appx835, which was denied on June 28, 2022. Appx51-65. On August 19, 2022, pursuant to 35 U.S.C. §142 and 37 C.F.R. §90.2(a), Voice Tech filed a Notice of Appeal. Appx874-877. This Court has jurisdiction over this appeal from the Final Written Decision under 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. §141(c).

## STATEMENT OF THE ISSUES

This appeal challenges determinations made by the Board in its Final Written Decision on the following issues:

A petitioner has the burden of establishing unpatentability, and it is obliged to make an adequate case in its petition. *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015). Further, the Board is not free to adopt arguments on behalf of petitioners. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1374 (Fed. Cir. 2016). In this case, Unified failed to address, or even mention, the "mobile device interface" limitation in claims 5 and 7. The Board created arguments on this key limitation for Unified and allowed Unified to add these

"arguments" to its Reply. Did the Board err in finding that Unified met its burden of proof? Did the Board err in creating arguments for Unified? Did the Board err in overruling Voice Tech's objections to Unified adding these new "arguments" to its Reply?

Even if a term has its plain and ordinary meaning, it may still require construction—particularly a technical term. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). In this case, the Board failed to clearly define the technical terms "audio command interface" and "mobile device interface"—both of which the Board relied on for its obviousness analysis. Did the Board err in failing to construe these terms?

In order to prove obviousness, a petitioner must articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness. *Magnum*, 829 F.3d at 1380. In this case, Unified failed to establish that the combination of Wong and Beauregard disclosed or rendered obvious the audio command interface or the mobile device interface, as well as the claimed functions of the audio command interface. Did the Board err in finding that Unified satisfied its burden of proving obviousness?

Hindsight analysis is inappropriate because obviousness must be assessed at the time the invention was made. *InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). In this case, Unified

failed to argue or submit any evidence to support why a POSITA ***at the time of the invention*** would have been motivated to combine Wong and Beauregard. Did the Board err in finding that Unified satisfied its burden of proving obviousness?

## STATEMENT OF THE CASE

### I. WONG AND BEAUREGARD[1]

Wong describes a system for a person to use voice commands with her mobile device to annotate and retrieve electronic files stored on a computer. Appx1280, [0012]–[0014]. The specific embodiment described in Wong is a person using a photo application that annotates and retrieves digital photos. Appx1281, [0035]. The person uses the photo application to create a keyword database and index of her photos with any associated text/keyword annotations and/or voice annotations desired. *Id*. Any word or phrase a person wishes to associate with one or more images may be used as a keyword. Appx1282, [0051].

In operation, the photo application listens on the Internet for incoming connections from the person's smart phone. Appx1281, [0035]. The person records a voice command, such as "show hot air balloon," on her smart phone, which may then be downloaded to the person's computer as an audio note. Appx1282, [0043] and [0055]. The voice command may include a command word portion and a

[1] U.S. Pat. Pub. 2006/0235700A1 ("Wong"), Appx1273-1293, and U.S. Pat. 6,438,545B1 ("Beauregard"). Appx1294-1357.

keyword. Appx1281, [0039]. In the example "show hot air balloon," the command word portion would be "show," and the keyword would be "hot air balloon." Appx1282, [0055]. In that example, the person "may speak the phrase 'show hot air balloon' to retrieve all images associated with the keyword 'hot air balloon.'" *Id*.

According to Wong, a speech engine may perform speech-to-text translation (referred to in Wong as "parsing") on the audio note. Appx1282, [0045]. The phone application searches the keyword database in an attempt to identify a match with the translated command, *id*., and if the phone application finds a matching keyword in the database, then the images associated with the keyword are transmitted to the smart phone." Appx1281-1283, [0040]-[0041], [0058], [0063].

Beauregard, which predates Wong, is focused on computer shortcuts, also known as macros. Appx1327, 3:10-19. Beauregard describes shortcuts tied to voice input, which Beauregard refers to as "action words." Appx1328, 5:22-38. Beauregard describes a system that would allow a user to speak a customized shortcut rather than use shortcuts provided by others. Appx1327, 4:26-38. In operation, the first step described in Beauregard is that the user must configure the system because all action words are defined by the user. Appx1330, 9:22-23. Once the system is configured by the user, the user may enter a spoken utterance into a microphone attached to the user's computer. Appx1333, 16:60-62. The spoken

utterance is translated from speech to text by a separate, third-party software. Appx1332, 14:5-12.

Next, the translated text is sent to a component referred to as the "fetcher," which compares the translated text to the preconfigured database (referred to as a "wordbase") to see if the translated text *matches* any user-defined action words. Appx1338, 25:17-18; Appx1339, 28:54-64. In the wordbase, each action word is linked to a service script, which includes instructions to be carried out if the action word is entered. Appx1334, 17:38-41. If the fetcher finds a match in the wordbase, the instructions linked to the action word are carried out so that the instructions are sent to a command interpreter, which sends the instructions to the application designated in the user's instructions. Appx1330, 10:5-8; Appx1331, 11:22-24; Appx1348, 45:29-31. Thus, Beauregard discloses a system wherein the user can create her own voice macros to augment or replace standard macros.

Therefore, Wong and Beauregard both require the user to preconfigure data in a database before the user can begin. Both Wong and Beauregard disclose speech-to-text translation, which Wong refers to as "parsing." Beauregard employs a third-party software to perform this speech-to-text translation. Finally, both Wong and Beauregard employ a matching function in order to match the command to the user's preconfigured instructions.

## II. THE ‘679 PATENT

The ‘679 patent is a continuation of U.S. Patent No. 9,794,348 (“the ‘348 patent”), which was filed on June 4, 2007. Appx66. It describes “a system for using voice commands from a mobile device to remotely access and control a computer.” Appx70, 1:8-10. The ‘679 patent also describes a number of key advantages of the disclosed system over the prior art:

> However, such prior art systems are application-specific, meaning they are configured to allow the person to use voice commands from a mobile device to remotely access and control a specific application at a computer. Therefore, prior art systems require the person to have multiple mobile devices and/or systems to remotely access and control the different applications at a computer.

Appx70, 1:17-24. During prosecution of the ‘348 patent, the inventor explained that the systems and methods described allow the person using the mobile device to “see and hear the images and sounds generated at the general purpose computer, regardless of the native application or operating system function that is used to generate such images and sounds.” Appx2249. “As such, each native application or operating system of the general purpose computer is not required to be configured to remotely interact with the mobile device.” *Id*.

Each claim of the ‘679 patent requires an “audio command interface,” which receives audio data, decodes the audio data into a command, and then decides the appropriate operating system or application, which the audio command interface

then selects. Appx74-75. Claims 5 and 7 each require a "mobile device interface," which transmits output data to a mobile device. Appx75.

## III. PROCEDURAL HISTORY

On February 18, 2020, Voice Tech sued Mycroft AI Inc. in the Western District of Missouri for infringing the '348 and '679 patents. Appx3083-3084. On June 5, 2020, Unified filed its IPR petition in the proceeding below, Appx177, which was instituted on December 14, 2020. Appx256. On December 13, 2021, the Board issued its Final Written Decision holding all challenged claims unpatentable under 35 U.S.C. §103(a) over Wong and Beauregard. Appx49. Voice Tech filed a request for rehearing on January 12, 2022, which was denied on June 28, 2022. Appx51. Voice Tech filed its notice of appeal on August 19, 2022. Appx874-877.

## SUMMARY OF ARGUMENT

The Board held that claims 1-8 of the '679 patent are unpatentable under 35 U.S.C. §103(a) over Wong and Beauregard. Appx49. This holding was in error for several reasons.

*First*, in its Petition, as well as the materials submitted with its Petition, Unified completely failed to include or address the "mobile device interface". Appx76-179, Appx2501-2504, Appx2553-2555, Appx1213-1272. Thus, Unified failed to meet its burden of proof to establish the unpatentability of claims 5-8. When Voice Tech initially pointed out this failure, Appx215-218, the Board responded by

improperly creating an argument on Unified's behalf. Appx280-282. Voice Tech reiterated this failure in its Response, Appx366-371, which was followed by Unified improperly adding the Board's "argument" to its Reply, Appx590-593, and the Board improperly overruled Voice Tech's objections to this new Reply "argument." Appx42.

*Second*, the Board incorrectly found that Wong, alone or in combination with Beauregard, discloses an "audio command interface" despite the fact that neither reference's alleged "audio command interface" discloses the features of the "audio command interface" required by the claims. The Board acknowledged that Wong's speech engine alone does not perform the deciding/selecting limitations required of an audio command interface, Appx33, and Wong does not disclose the speech engine performing decoding. Further, Beauregard explicitly states that its MIKE 330 does not receive audio data, another requirement for an audio command interface. Appx2897. Additionally, both Wong and Beauregard ultimately disclose a database preconfigured by the user to perform a specific function when a specific preconfigured word or phrase is spoken. Appx1281, [0040]; Appx1330, 10:5-8. Thus, there is no decision-making being performed by the systems of Wong or Beauregard because everything is preconfigured by the user. Also, a POSITA would not have been motivated to combine these references given that they perform the same matching function.

*Third*, Unified failed to address why a POSITA ***at the time of the invention*** would have been motivated to combine Wong and Beauregard, succumbing to hindsight bias in its obviousness analysis.

Therefore, the Board's finding that claims 1-8 are unpatentable should be reversed.

## ARGUMENT

### I. THE BOARD'S ERRORS RELATED TO THE "MOBILE DEVICE INTERFACE"

Claims 5 and 7 include the following elements:

| | |
|---|---|
| Element [5.8] | wherein ***a mobile device interface*** at the computer transmits the output data to the mobile device[2] |
| Element [7.8] | wherein ***a mobile device interface*** at the computer transmits the output data to the mobile device[3] |

In its Petition, Unified completely failed to include or address these "mobile device interface" ("MDI") limitations. Appx76-135. It also failed to include the MDI limitations in its claim charts separately submitted with its Petition. Appx2501-2504, Appx2553-2555. Further, Unified's declarant completely failed to include or address these MDI limitations anywhere in his declaration. Appx1213-1272. Thus, Unified failed to meet its burden of proof to establish the unpatentability of claims 5-8

[2] Appx75 (emphasis added).
[3] *Id*. (emphasis added).

because it failed to address at least one of the claim limitations in claims 5 and 7—the "mobile device interface".[4]

Despite Unified's complete failure, however, the Board incorrectly found that Unified met its burden of proof to establish that claims 5-8 are unpatentable. Appx41-47.[5] The Board attempted to justify its erroneous finding by improperly creating an argument for Unified. *Id*. When Voice Tech complained about the Board creating arguments for Unified, Appx366-371, the Board claimed it had done no such thing. Appx42. The record shows otherwise.

Unified then incorporated the Board's "argument" into its Reply with a new declaration. Appx590-593, Appx2736-2743. In fact, Unified even quoted the Board's "argument" as part of its Reply. Appx591. Voice Tech objected to the new Reply arguments and evidence, but the Board erroneously overruled Voice Tech's objections. Appx42.

Therefore, the Board was wrong to find that Unified met its burden of proof to establish that claims 5-8 are unpatentable, and the Board's decision as to claims 5-8 should be reversed.

---

[4] Claims 6 and 8 depend on claims 5 and 7, respectively. Appx75.

[5] *See also* Appx280-282. This Court has "jurisdiction to review determinations made during institution that are subsequently incorporated into the Board's final written decision." *Magnum*, 829 F.3d at 1374.

### A. The Board erred by finding that Unified satisfied its burden to prove that the combination of Wong and Beauregard teaches the MDI limitations in claims 5 and 7.

Unified had the burden to establish unpatentability by a preponderance of the evidence. *Cuozzo Speed Technologies, LLC v. Lee,* 136 S.Ct. 2131, 2144 (2016). Further, Unified was "obliged to make an adequate case in its Petition and the Reply limited to a true rebuttal role." *Ariosa*, 805 F.3d at 1367.

In its Petition, Unified asserted that claims 5-8 are obvious over Wong in view of Beauregard. Appx89. "Obviousness is a question of law based on underlying findings of fact." *Elbit Systems of America, LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356-1357 (Fed. Cir. 2018) (citation omitted). One of these underlying findings of fact is "differences between the prior art and the claims at issue." *Id*. at 1357. "A patent claim is invalid 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the [relevant] art ['PHOSITA'].'" *Id*. at 1356.

This Court reviews the Board's factual findings for substantial evidence and its legal conclusions de novo. *Id*. "'Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence,' meaning that '[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). "If two 'inconsistent conclusions may

reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'" *Id*. (citation omitted).

In this case, the Board's holding that Unified satisfied its burden to prove that the combination of Wong and Beauregard teaches the MDI is not supported by substantial evidence. Unified's Petition, its claim charts, and its expert declaration completely failed to include or address the MDI in claims 5 and 7. Appx76-179, Appx2501-2504, Appx2553-2555, Appx1213-1272. Instead of recognizing Unified's failure, however, the Board created arguments on Unified's behalf.

### 1. Unified's Actual Petition Arguments for Claim 5

In its Petition, Unified asserted that system claim 5 is substantively similar to method claims 1 and 2. Appx130. Unified also asserted that claim 5's limitations "are obvious for the same reasons as ***the corresponding limitations*** in claims 1 and 2, charted below." Appx130-131 (emphasis added). Importantly, Unified then made the following statement: "***The limitations with differences*** are also rendered obvious for the reasons addressed in the chart ***and further explained below***." Appx131 (emphasis added). Thus, any differences between claim 5 and claims 1 and 2 were, according to Unified, to be addressed in the claim 5 chart and the claim 5 argument section. Unified explicitly stated that it was not relying on its discussions of claims 1 and 2 for any limitations found in claim 5 but not present in claims 1 and 2.

Next, Unified recited element [5.8] in its chart as follows:

| | | |
|---|---|---|
| [5.8] | *transmitting the output data to the mobile device.* | [1.6] |

Appx132. Element [1.6] reads as follows: "transmitting the output data to the mobile device." Appx74. However, Unified incorrectly recited element [5.8], which actually reads as follows: "wherein ***a mobile device interface*** at the computer transmits the output data to the mobile device." Appx75 (emphasis added). Thus, Unified failed to include the MDI in its claim 5 chart, and it failed to address the MDI as part of its claim 5 argument.

It should also be noted that, in the claim 5 chart, Unified specifically referred to the need to address the differences between elements [5.1] and [5.2] and elements [1.0] and [2.1], respectively:

| | | |
|---|---|---|
| [5.1] | *a computer;* | [1.0], see additional explanation below |
| [5.2] | *a communications medium that couples the mobile device to the computer; and* | [2.1], see additional explanation below |

Appx131.[6] Unified then specifically addressed the different limitations found in elements [5.1] and [5.2] ("see additional explanation below") but not present in elements [1.0] and [2.1]. Appx132-133.

That is the entire argument for claim 5. Unified failed to recite the MDI in its claim 5 chart. It did not indicate in its chart the need to address the differences between element [5.8] and element [1.6] by including the language "see additional explanation below" as it did with the entries for elements [5.1] and [5.2]. Further, Unified completely failed to address the MDI in its discussion of claim 5. This is not disputed. It is plainly laid out in Unified's Petition. Appx130-133.

### 2. Unified's Actual Petition Arguments for Claim 7

In its Petition, Unified asserted that system claim 7 is substantively similar to method claims 1, 3, and 5. Appx134. Unified then asserted that the "***corresponding limitations*** of Claims 1, 3, and 5, identified in the chart below, show how each limitation of claim 7 is disclosed or rendered obvious by *Wong* or *Wong* in view of *Beauregard*." *Id*. (emphasis added). The following is the entry for element [7.8] in the claim 7 chart:

[6] Preamble [1.0] reads, "A method of accessing and controlling a computer from a mobile device, comprising." Appx74. Element [2.1] reads, "The method of claim 1, wherein the mobile device is not physically connected to the computer and the application selected by the audio command interface is installed on the computer." *Id*.

| | | |
|---|---|---|
| [7.8] | *transmitting the output data to the mobile device.* | [1.6] |

Appx135. Element [1.6] reads as follows: "transmitting the output data to the mobile device." Appx74. However, Unified incorrectly recited element [7.8], which actually reads as follows: "wherein ***a mobile device interface*** at the computer transmits the output data to the mobile device." Appx75 (emphasis added). Thus, Unified failed to include the MDI in its claim 7 chart, and it failed to address the MDI as part of its claim 7 argument.

That is the entire argument for claim 7. Unified failed to recite the MDI in its claim 7 chart. Further, Unified clearly stated that any "***corresponding limitations*** of Claims 1, 3, and 5, identified in the chart below, show how each limitation of claim 7 is disclosed or rendered obvious by *Wong* or *Wong* in view of *Beauregard*." Appx134 (emphasis added). The MDI is not a "***corresponding limitation***" because claim 1 does not recite the MDI. Appx74. Thus, Unified completely failed to refer to the MDI in its claim 7 argument, and there is no basis whatsoever to look to the discussion of claim 1 for arguments regarding the MDI. Yet, the Board incorrectly did so.

### 3. Unified's Actual Petition Arguments for Element [1.6]

As just established, there was no reason to look to Unified's discussion of element [1.6] for an argument on the MDI. Element [1.6] does not recite the MDI. Appx74. Further, Unified explicitly stated that any differences between claim 5 and

claims 1 and 2 were to be addressed in the claim 5 chart and the claim 5 argument. Appx130-131. Unified also stated that it was not relying on its discussions of claims 1 and 2 for any limitations found in claim 5 but not present in claims 1 and 2. *Id*. (stating that claim 5's limitations "are obvious for the same reasons as ***the corresponding limitations*** in method claims 1 and 2, charted below.") (emphasis added). Additionally, as to its claim 7 arguments, Unified clearly stated that it was only referring to claims 1, 3, and 5 for "***corresponding limitations***," Appx134, and element [1.6] does not include the MDI. Appx74-75. Therefore, there is absolutely no reason to look to Unified's discussion of element [1.6] for arguments on the MDI, but that is what the Board did.

Looking at the discussion of element [1.6] for argument's sake, Unified asserted that Wong discloses, or at least renders obvious, element [1.6], and then Unified began its argument for element [1.6], which does not include the MDI. Appx119. Unified argued that Wong discloses the transmitting step of element [1.6], but there is no reference to, much less discussion of, the MDI. Appx120-121. Unified then asserted that a POSITA would have been motivated to incorporate Beauregard's teachings related to accessing a variety of services into Wong's system. Appx121. Lastly, Unified included the following statement to end the discussion of element [1.6]:

> To a POSITA, transmitting the output data would entail common steps regardless of whether it was generated via an operating-

> system or application command because computer applications generally used built-in services of the computer operating system to provide a means to transmit output data to other applications, operating systems or devices. *See* Ex. 1003, ¶¶ 63-68.

*Id*. Exhibit 1003, cited here, is McNair's Declaration. Appx1213-1272. In fact, despite the lack of quotation marks, the excerpt is taken verbatim from Paragraph 63 of McNair's Declaration. Appx1253-1254.

That is the entirety of Unified's argument related to element [1.6]. There is no mention of the MDI anywhere in McNair's Declaration. Thus, there is no evidence regarding the MDI. Therefore, even looking at Unified's discussion of element [1.6] for argument's sake, Unified still failed to meet its burden of proof to establish the unpatentability of claims 5 and 7 because it failed to address, or even mention, the MDI.

#### 4. The Board's Arguments Created for Unified

In its Preliminary Response, Voice Tech argued that Unified completely failed to submit arguments or evidence that the MDI would have been obvious. Appx215-218. Yet, the Board found that "Petitioner had sufficiently demonstrated the combination of Wong and Beauregard teaches the mobile device interface limitation."[7] Appx281. The Board recognized Unified's failure to identify the MDI,

---

[7] Voice Tech does not contest institution of this IPR. This history merely explains the events leading to the Board's erroneous holdings. This Court has "jurisdiction to review determinations made during institution that are subsequently incorporated into the Board's final written decision." *Magnum*, 829 F.3d at 1374.

but generally asserted that Unified had mapped its analysis of the MDI to claim 1. *Id*. However, the Board's assertion is contradicted by Unified's explicit statement that the references to element [1.6] were only for ***corresponding limitations***. Appx130-131, Appx134.

Regardless, the Board ignored Unified's explicit statements and proceeded to consider Unified's discussion of element [1.6]. The Board then found that Unified sufficiently demonstrated how Wong's PC 210 transmits output data to mobile device 202. Appx281 (citing Appx119-121). Yet, Unified made no mention of the MDI anywhere in the Petition. Appx119-121. The Board then referred to the single mention of "built-in services," stating that "built-in services" met the definition of a "mobile device interface." Appx281. Yet, Unified made no such allegation in its Petition. Appx119-121. In fact, Unified made absolutely no comparison of "built-in services" to the MDI. *Id*. This entire argument was created by the Board on Unified's behalf.

In its Response, Voice Tech once again argued that Unified had failed to raise arguments or submit evidence that the MDI would have been obvious. Appx366-371. Voice Tech pointed out that Unified had failed to meet its burden of proof because it failed to address the MDI at all. Appx370. Further, Voice Tech argued that the Board is not free to raise its own obviousness arguments to make up for Unified's failure. Appx370-371 (citing *Magnum*, 29 F.3d at 1381).

Yet, in its Final Written Decision, the Board reiterated the arguments it had created for Unified in its Institution Decision. Appx41-47. The Board incorrectly pointed to the cross-reference to element [1.6] for corresponding limitations in elements [5.8] and [7.8]. Appx41. The Board failed to accept the fact that the MDI in elements [5.8] and [7.8] were not corresponding limitations because element [1.6] does not include the MDI. Appx42. The Board acknowledged that Unified had failed to properly recite elements [5.8] and [7.8]. *Id*. Yet, once again the Board excused this failure as a "clerical error" despite the fact that the MDI is not mentioned at all in the Petition, in Unified's separate claim charts, or in McNair's Declaration. Appx43. The Board then, once again, stated that there is a reference to Wong's PC 210 and "built-in services" in the discussion of claim 1 and that "built-in services" meets the definition of MDI. Appx43-44.

**5. The Board erred by finding that Unified satisfied its burden of proof.**

Unified failed to satisfy its burden to prove that the combination of Wong and Beauregard teaches the MDI in claims 5 and 7, and the Board erred by finding otherwise. The Board's finding is not supported by any evidence, much less substantial evidence. A review of Unified's claim 5 chart and claim 5 discussion in its Petition shows that Unified completely failed to include any arguments regarding claim 5's MDI. Appx130-133. A review of Unified's claim 7 chart and claim 7 discussion in its Petition likewise shows that Unified completely failed to include

any arguments regarding claim 7's MDI. Appx134-135. Further, Unified made it clear in its discussions of claims 5 and 7 that its chart references to element [1.6] only applied to ***corresponding limitations***, which does not include the MDI. Appx130-131, Appx134. Even looking at the element [1.6] discussion for argument's sake, there is absolutely no discussion of the MDI. Appx119-121. Unified did not argue that Wong's PC 210 somehow taught the MDI. *Id*. Additionally, Unified did not argue that the single mention of "built-in services" met the definition of "mobile device interface." *Id*.

Thus, there is no evidence, much less substantial evidence, to support a finding that Unified met its burden to prove that the combination of Wong and Beauregard teaches the MDI in claims 5 and 7. Therefore, the Board was wrong to find that Unified met its burden of proof to establish that claims 5-8 are unpatentable, and the Board's decision as to claims 5-8 should be reversed.

Reversal would be consistent with this Court's prior decisions. For example, in *Elbit*, this Court agreed with the Board that the petitioner failed to meet its burden of proving the asserted claims unpatentable because the petitioner had not directed the Board to prior art of record that allegedly taught the limitation-at-issue. *Elbit*, 881 F.3d at 1357. Further, the petitioner's "expert's testimony was 'unsupported' and entitled to 'little weight' because he did not address or account for the recited

relative angular rate signal limitation 'anywhere in his opinion.'" *Id*. at 1358. In this case, Unified and its expert failed to even mention the MDI.

Yet, the Board did not follow *Elbit* instead finding it to be inapposite. Appx45. It asserted that in *Elbit* the prior art and the asserted claims employed different steps, whereas in this case the Board contended that the combination of Wong and Beauregard teaches the same steps as the claims. *Id*. That assertion reveals a misunderstanding of *Elbit*.

In *Elbit*, one part of the dispute was related to expert testimony on different steps being employed to make mathematical calculations. *Elbit*, 881 F.3d at 1357. The patent owner's expert provided testimony distinguishing between the steps employed in the asserted claims and the steps employed in the prior art. *Id*. at 1358. However, the petitioner's expert merely argued that the steps were "mathematically equivalent" and that "there was no practical difference" between them. *Id*. The Board found the petitioner's expert's testimony was "unsupported" and entitled to "little weight" because he did not address one of the asserted claim limitations "anywhere in his opinion." *Id*. Given the many "deficiencies" in the testimony of the petitioner's expert, the Board concluded that the petitioner had not met its burden of proving the asserted claims unpatentable. *Id*. at 1357.

Thus, the issue was that the petitioner failed to satisfy its burden of proof—not simply that there were different steps employed in the asserted claims and the

prior art. Given petitioner's lack of evidence on certain claim limitations related to the steps used to make mathematical calculations, the petitioner failed to meet its burden of proof. In this case, Unified failed to meet its burden of proof to establish the unpatentability of claims 5-8 because it completely failed to make any arguments on, or even mention, the MDI. Here, the Board should have found that Unified had not met its burden as to claims 5-8 given its failure to address the MDI at all.

The Board also asserted that in *Elbit* this Court affirmed a Board finding that the petitioner had not met its burden of proof because it was "undisputed" that a method step in the challenged claim was "not explicitly disclosed" in the prior art. Appx45. Yet, although it was undisputed in *Elbit* that the limitation was not *explicitly* disclosed in the prior art, there was a dispute between the experts as to whether that limitation was taught by the prior art. *Elbit*, 881 F.3d at 1358. This Court gave no credence to the petitioner's expert, however, because he had failed to even mention the limitation in his opinion. *Id*. at 1359. Thus, the point of *Elbit* is that there was no expert testimony on the limitation. *Id*. at 1358. It is the same situation here. Unified did not mention the MDI limitation, and neither did its expert.

The Board also asserted that it found McNair's testimony on "built-in services" credible, and it agreed with Unified's Reply "argument" that "built-in

services" map to the Board's construction of "mobile device interface." Appx45.[8] The Board then asserted that since the Federal Circuit defers to it on weighing the credibility of witnesses and evidence, its decision on "built-in services" prevails. *Id*. Yet, the issue here is whether Unified met its burden of proof as to establishing unpatentability of claims 5-8 when it completely failed to address the MDI. The single mention of "built-in services" relied upon by the Board is not an argument on the MDI. The Board simply created an argument based on the term "built-in services" and then found that single mention of it in McNair's Declaration to be credible. Unified did not argue that "built-in services" are in any way tied to the MDI, so there is no reason to evaluate whether McNair's single mention of "built-in services" was credible.[9] Further, none of that remedies Unified's failure to argue, or even mention, the MDI.

More recently, this Court agreed with the Board's decision in *Choirock Contents Factory Co., Ltd. v. Saucier*, 801 Fed. Appx. 754 (Fed. Cir. Feb. 21, 2020) (nonprecedential), and affirmed the Board's IPR decision that the patent-at-issue was ***valid***. *Id*. at 768. In *Choirock*, this Court agreed with the Board's finding that

---

[8] The Board's reliance on this Reply argument contradicts its statement in the Rehearing Denial that it did not rely on Unified's Reply arguments on the MDI. Appx59.

[9] The Board criticized Voice Tech for not deposing McNair on his single mention of "built-in services," Appx44, but there was no reason to do so. Neither Unified nor McNair made any connection between "built-in services" and the MDI.

the petition had not clearly identified where a prior art reference taught a limitation-at-issue. *Id*. at 765. This Court further agreed that the petitioner also failed to address and introduce evidence as to another disputed limitation. *Id*. at 768. Thus, the Board was correct in holding that the petitioner had failed to establish that the claim-at-issue and its dependent claims would have been obvious in light of the prior art asserted. *Id*.

In this case, however, the Board took the position that *Choirock* is inapposite because the *Choirock* petition did not cross-reference a limitation the petitioner subsequently tried to rely on, whereas the Petition in this case allegedly cross-referenced the claim 1 "transmitting" limitation. Appx45. Yet, this statement is wrong because Unified made absolutely no demonstration, argument, or mention of the MDI in the Petition or in any of the materials submitted with the Petition. Appx76-179, Appx2501-2504, Appx2553-2555, Appx1213-1272. Further, as already shown, Unified's cross-references to element [1.6] were expressly intended to only address ***corresponding limitations*** in elements [5.8] and [7.8], which did not include the MDI. Appx130-131, Appx134. Any noncorresponding limitations in claims 5 and 7 were to be addressed in the discussions of claims 5 and 7. Appx130-135. So, there was absolutely no reason to look to Unified's discussion of element [1.6] for arguments on the MDI given that element [1.6] does not contain the MDI.

Further, in *Choirock*, the Board considered the petitioner's claim 2 arguments despite no cross-reference, but the Board still found that the petitioner had failed to prove one of the prior art references disclosed a specific limitation in claims 7 and 8. *Choirock*, 801 Fed. Appx. at 764 (finding that the petitioner's claim 2 argument "failed to address the limitation of claims 7 and 8 requiring that the revealers move to expose previously unexposed images."). Thus, the Board in *Choirock* "denied institution of claims 7 and 8 because it found that none of those portions of the petition even mentioned the claimed requirement of an 'image,' let alone explained how that requirement was met." *Id*. In this proceeding, Unified similarly failed by not even mentioning the MDI.

Despite this Court's holdings in *Choirock*, the Board held that the single mention of "built-in services" in the discussion of claim 1 was sufficient to make an entire argument for the MDI found in claims 5 and 7. Appx46. This ignored the holdings in *Choirock*, which require ***clear identification*** of where the prior art teaches a limitation. *Choirock*, 801 Fed. Appx. at 765, 768. In this case, there is no suggestion in Unified's Petition or the materials submitted with the Petition that anything was referring to the MDI, including the single mention of "built-in services."

Lastly, the Board referred to two Federal Circuit decisions related to the ipsissimis verbis test.[10] Appx46. However, that test is not applicable here. In *Gleave*, this Court stated as follows:

> A reference is anticipatory under § 102(b) when it satisfies particular requirements. First, the reference must disclose each and every element of the claimed invention, whether it does so explicitly or inherently. While those elements must be 'arranged or combined in the same way as in the claim,' the reference need not satisfy an ipsissimis verbis test.

*Gleave*, 560 F.3d at 1334 (citing *Bond*, 910 F.2d at 832-833). Thus, the ipsissimis verbis test addresses the disclosures in a prior art reference for purposes of an anticipation analysis. That test is not applicable here. The issue here is not what was disclosed in a prior art reference. The issue here is whether Unified included any arguments on the MDI in its Petition, and the fact is that it did not. The ipsissimis verbis test is not used to determine whether an IPR petitioner made an argument in its Petition.

Therefore, a reasonable mind would not accept the evidence cited by the Board as adequate to support its conclusion that Unified demonstrated in its Petition how the combination of Wong and Beauregard teaches the MDI recited in claims 5 and 7. Thus, the Board's decision is not supported by any evidence, much less substantial evidence, and should be reversed.

---

[10] *In re Bond*, 910 F.2d 831 (Fed. Cir. 1990) and *In re Gleave*, 560 F.3d 1331 (Fed. Cir. 2009).

### B. The Board erred by creating new invalidity arguments for Unified.

Unified had the burden to establish unpatentability by a preponderance of the evidence. *Cuozzo*, 136 S.Ct. at 2144. Further, Unified was "obliged to make an adequate case in its Petition and the Reply limited to a true rebuttal role." *Ariosa*, 805 F.3d at 1367. The Board is not "free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR." *Magnum*, 829 F.3d at 1381. "Thus, while the PTO has broad authority to establish procedures for revisiting earlier-granted patents in IPRs, that authority is not so broad that it allows the PTO to raise, address, and decide unpatentability theories never presented by the petitioner and not supported by record evidence." *Id*. Yet, despite these limits on the Board's authority, in this proceeding the Board created arguments on Unified's behalf.

As already established above, Unified did not make any arguments, or even mention, the MDI anywhere in its Petition or anywhere in the materials submitted with the Petition. Appx76-179, Appx2501-2504, Appx2553-2555, Appx1213-1272. The discussions of elements [5.8] and [7.8] do not include any arguments on the MDI, and the Board even acknowledged this. Appx42. Even looking at element [1.6] for argument's sake, there is no mention of the MDI, which is not surprising given that element [1.6] does not include the MDI. Appx119-121. The single mention of the term "built-in services" in the discussion of element [1.6] was not an argument

for the MDI, and Unified made no argument that "built-in services" met the definition of MDI. Thus, the Board did not have sufficient evidence on which to base its obviousness conclusion for the MDI, and so it improperly created an argument on Unified's behalf. Therefore, the Board's determination that claims 5-8 are unpatentable should be reversed.

### C. The Board erred by overruling Voice Tech's objections to Unified's new Reply arguments.

In an IPR proceeding, a petitioner is "obliged to make an adequate case in its Petition and the Reply limited to a true rebuttal role." *Ariosa*, 805 F.3d at 1367. It has already been established above that Unified failed to submit any arguments on, or even mention, the MDI in its Petition or any of the materials submitted with its Petition. Further, it has already been established that the Board created new arguments related to the MDI on Unified's behalf in the Institution Decision, which were incorporated by the Board into its Final Written Decision. In its Reply, Unified adopted the Board's arguments as its own and submitted a new declaration. Appx590-591. In fact, Unified even quoted the Board's arguments in its Reply. Appx591 (quoting Appx281-282).

In its Surreply, Voice Tech objected to Unified's new arguments on the MDI and pointed out that Unified was trying to cover up its error with new Reply arguments and evidence, which should not be considered. Appx605. Voice Tech

pointed out that Unified was "obliged to make an adequate case in its Petition and the Reply limited to a true rebuttal role." *Id*. (citing *Ariosa*, 805 F.3d at 1367).

The Board disagreed that Unified's new Reply argument was a new argument. Appx42. The Board improperly concluded that these new Reply arguments were already in the Petition. Appx43. Yet, it has already been shown that these arguments were not included in the Petition and that Unified's Reply arguments on the MDI were taken from the Board's Institution Decision. The Board referred to this as simply "a more fulsome explanation." *Id*. It also held that Unified's new argument on how the "built-in services" satisfies the definition of "mobile device interface" was allowable because Unified was simply responding to Voice Tech's Response. Appx43-44. Yet, Unified's Reply argument on the definition of "mobile device interface" is nothing more than a direct quote taken from the Institution Decision. Appx591 (quoting Appx281-282). Unified was not replying to the Response. It was restating, verbatim, the Board's arguments that it was adopting.

The Board was not allowed to consider new Reply arguments or evidence, but it did so when it considered Unified's new Reply arguments copied and pasted from the Board's Institution Decision. *Ariosa*, 805 F.3d at 1367. Thus, the Board erred in allowing these new Reply arguments and evidence, and it was improper for the Board to consider any of the improper Reply arguments or evidence in reaching its decision. Therefore, the Board's decision to overrule Voice Tech's objection should

be reversed, and the Board's decision finding claims 5-8 unpatentable should be reversed.[11]

## II. CLAIM CONSTRUCTION

There are two technical terms that required construction by the Board. The first was "audio command interface," which is found in every claim of the '679 patent and plays a central role in the validity of these claims. The second is "mobile device interface," which Unified completely failed to mention, found in claims 5 and 7 of the '679 patent.

### A. Standard of Review

This Court reviews "claim construction de novo and any subsidiary factual findings based on extrinsic evidence for substantial evidence." *Apple Inc. v. MPH Technologies Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022). "Claim terms are generally given their plain and ordinary meaning, which is the meaning one of ordinary skill in the art would ascribe to a term when read in the context of the claim, specification, and prosecution history." *Id*. Even if a term has its plain and ordinary meaning, it may still require construction. *Ethicon*, 103 F.3d at 1568. This is particularly true for technical terms. *Id*. Claim construction is required "when the meaning or scope of

---

[11] The Board's reliance on new Reply arguments, such as that "built-in services" meets the definition of "mobile device interface," contradicts its statement in the Rehearing Denial that it did not rely on Unified's Reply arguments as to MDI. Appx59.

technical terms and words of art is unclear and in dispute and requires resolution in order to determine obviousness." *Id*.

**B. "Audio Command Interface"**

Each claim of the '679 patent contains the term "audio command interface" ("ACI"). Appx74-75. A POSITA would have understood the term "audio command interface" to mean "a functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables a mobile device to access and control one or more operating systems and/or one or more applications at the computer without requiring voice command interoperability between the mobile device and each separate operating system or application." Appx2884. This construction is supported by the specification and claim language of the '679 patent, the prosecution history, and technical dictionary evidence. *Id*.

For example, the specification explicitly states that the ACI "can be implemented in hardware, software, or a suitable combination of hardware and software." Appx70, 2:38-45. Further, this explains that the ACI is a functional component of a computer. Appx2885.

The specification also explains that the ACI "provides the person with the ability to access and control both native applications that are configured for direct interaction with a mobile device as well as native applications that are not configured

for direct interaction with a mobile device." Appx73, 7:36-49. This supports the portion of the proposed definition addressing enablement of the mobile device to access and control a computer, as well as the fact that the ACI allows such access and control without requiring direct interaction between the mobile device and applications. Appx2887-2888.

Additionally, during prosecution of the '348 patent, the patentee explained the importance of the ACI:

> While such systems have been generally known in the prior art, unlike prior art systems that require voice command interoperability be provided for *each separate native application*, the system and method of the present invention, with its "audio command interface" allows the mobile device to remotely access and control *both* operating system functions *and* native applications at the general purpose computer and/or to access and control *multiple* native applications at the general purpose computer.

Appx1768-1769. This explanation is based, in part, on the specification. Appx71, 4:45-57. This feature of the ACI was also emphasized during prosecution when the patentee argued that amending claims to include the ACI overcame prior art rejections because of the lack of a requirement for configuration or interoperability. Appx1865-1881.

Further, the term "interface" is defined as "Some form of electronic device that enables one piece of gear to communicate with or control another. A device

linking two otherwise incompatible devices, such as an editing terminal of one manufacturer to typesetters of another." Appx2816.

The Board determined that ACI should be given its plain and ordinary meaning, but it failed to explain what this plain and ordinary meaning is. Appx15. It generally held that nothing in the specification or the prosecution history of the '679 patent defined or limited the plain and ordinary meaning of the term ACI. Appx13. Essentially, the Board held that ACI has its plain and ordinary meaning so there is no need to construe it. Appx15. This is incorrect.

The Board found that the discussion that the ACI "can be implemented in hardware, software, or a suitable combination of hardware and software" was not limiting. Appx14. It decided that this was simply "an 'exemplary' embodiment rather than a limiting embodiment." *Id*. Yet, every embodiment of the ACI falls within this description. This description of the ACI was at the beginning of the specific description regarding Figure 1. Appx70 at 2:38-45. There is no discussion of alternatives to this. Next, the Board stated that "[i]n any event, all computer components can be implemented in hardware, software, or suitable combination of hardware and software." Appx14. Yet, if that is the case, this language should be a part of the definition of ACI.

In addition to the specification excerpts discussed above, the claims were also amended to overcome prior art, as acknowledged by the Board. Appx1865-1881.

The Board asserted that such positions did not matter because the claims were later abandoned in light of additional, later rejections. Appx14. Yet, this assertion is not supported by Federal Circuit law.

For example, in *Hester Industries, Inc. v. Stein, Inc.*, 142 F.3d 1472 (Fed. Cir. 1998), this Court discussed both the recapture rule and prosecution history estoppel, explaining that both prevent patentees "from regaining subject matter surrendered during prosecution in support of patentability." *Id*. at 1481. This Court also stated that surrender can occur even when the arguments are made without any claim amendments. *Id*. Thus, it would be inconsistent to hold that any such surrenders by the patentee would be ignored if the patentee decided to later abandon an amended claim. After all, according to this Court, arguments alone may be sufficient to surrender subject matter.

The Board also takes exception with the proposed construction including "mobile device." Appx14-15. Yet, the definition states that the ACI is capable of receiving information from the mobile device—not that it can only receive data from the mobile device. This is consistent with the language in the specification and prosecution history.

Therefore, the Board's decision not to construe ACI was in error. This term must be defined in order to properly evaluate Unified's obviousness arguments addressed below. Therefore, Voice Tech asks the Court to define "audio command

interface" as "a functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables a mobile device to access and control one or more operating systems and/or one or more applications at the computer without requiring voice command interoperability between the mobile device and each separate operating system or application."

### C. "Mobile Device Interface"

This term was added to claims 5 and 7 as part of an examiner's amendment. Appx1011-1015. Further, the Board specifically relied on the meaning of "mobile device interface" as part of its obviousness analysis. Appx43-44.

Claims 5 and 7 contain the following element: "wherein a mobile device interface at the computer transmits the output data to the mobile device." Appx74-75. A POSITA would have understood the term "mobile device interface" ("MDI") to mean "a functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables the computer to communicate with a mobile device through an appropriate communications medium." Appx2889. This construction is supported by the specification and claim language of the '679 patent, as well as technical dictionary evidence. *Id*.

For example, the specification of the '679 patent includes the following description:

> FIG. 2 is a diagram of system **200** for providing a mobile device interface in accordance with an exemplary embodiment of the present invention. System **200** includes network interface **202**, native application video output conversion **204**, and native application audio output conversion **206**, each of which can be implemented in hardware, software, or a suitable combination of hardware and software, which can be one or more software systems operating on a general purpose processing platform.

Appx71, 4:64-5:5.

Additionally, the term "interface" is defined as "Some form of electronic device that enables one piece of gear to communicate with or control another. A device linking two otherwise incompatible devices, such as an editing terminal of one manufacturer to typesetters of another." Appx2816.

In its Institution Decision, the Board agreed with Voice Tech's proposed construction of MDI. Appx266. Unified agreed with Voice Tech's construction as well, but it questioned whether construction was necessary. Appx590. "[T]he ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). However, in many cases giving rise to litigation, determining the ordinary and customary meaning of the claims requires examination of terms that have a particular meaning in the field of art because the meaning of a claim term as understood by a POSITA

is often not immediately apparent. *Id*. Here, the meaning of MDI is not immediately apparent, and it requires construction.

The Board agreed, but in the end it claimed it had an issue with the fact that the proposed definition included enablement language related to the mobile device. Appx16. The Board held that the MDI, despite its name, may also interact with "other suitable devices." *Id*. However, the language relied upon by the Board is specifically for the network interface 202:

> In one exemplary embodiment, network interface **202** can monitor a modem, such as a PSTN modem, cable modem, DSL modem, or other suitable modems for incoming data traffic that indicates that mobile device **102** or other suitable devices are attempting to interface with general purpose computer **104**.

Appx72, 5:8-13. The specification earlier explained the following:

> System **100** includes mobile device **102**, which can be a suitable mobile device such as a cellular phone, smart phone, touch-screen device, personal digital assistant, tablet device, notebook device, laptop device, or other suitable mobile device that allows communication with a computer via a wireless or wire-line network or a suitable combination of a wireless and wire-line network.

Appx70, 2:31-37. Thus, the reference to "other suitable devices" in the first excerpt is a reference to other suitable mobile devices as explained in the second excerpt. The Board incorrectly confused the meaning of "other suitable devices," which refers to different types of mobile devices. Thus, there is no basis for the Board's

determination that "a mobile device interface is not limited to an interface between a computer and a mobile device." Appx16.

The Board did construe MDI to "*include* hardware, software, or a combination thereof that enables communication between a computer and a mobile device." Appx16. However, the Board claimed that it was not relying on the meaning of MDI in making its decisions. *Id*. Yet, as discussed above, it found that a single reference to "built-in services" met the definition of MDI. Appx43-44. Therefore, the Board did rely on its construction of MDI when it equated MDI with "built-in services."

Therefore, the Board's decision not to clearly construe "mobile device interface" was in error. This term must be defined in order to properly evaluate the obviousness challenges to claims 5 and 7. Therefore, Voice Tech asks the Court to define "mobile device interface" as "a functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables the computer to communicate with a mobile device through an appropriate communications medium."

## III. CLAIMS 1-8 ARE PATENTABLE IN VIEW OF WONG AND BEAUREGARD.

In its Petition, Unified asserted that claims 1-8 of the '679 patent are obvious over Wong in view of Beauregard. Appx89. Voice Tech established that this assertion is wrong because certain limitations were not disclosed or taught by the combination of Wong and Beauregard. Yet, the Board incorrectly held that claims

1-8 are unpatentable, Appx49, and Voice Tech asks the Court to reverse the Board's decision.

**A. Standard of Review**

"Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, differences between the prior art and claims at issue, the level of ordinary skill in the pertinent art, [and] the motivations to modify or combine prior art ...." *Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1343 (Fed. Cir. 2020) (citation omitted). This Court reviews "the Board's legal decisions de novo and its factual determinations for substantial evidence." *Id.* Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (omitted citation). In order to "satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *Magnum*, 829 F.3d at 1380.

**B. The "Receiving" Elements**

Claims 1 and 3 both contain a "receiving" element, as shown in the table just below. Further, claims 5 and 7 both contain a "receives" element, as shown in the following table:

| | |
|---|---|
| Elements [1.1] and [3.1] | "receiving audio data from the mobile device, at the computer, at an audio command interface;"[12] |
| Elements [5.3] and [7.3] | "an audio command interface, at the computer, the audio command interface: receives audio data from the mobile device;"[13] |

Essentially, each element requires an audio command interface ("ACI") to receive audio data from the mobile device. These claims also have other limitations related to the ACI. For example, each claim requires the ACI to decode the audio data into a command. Appx74-75. Further, each claim also requires the ACI to decide what would be the appropriate operating system or application to execute a process in response to the command and then select that operating system or application. *Id*. These are some of the actions required of the ACI.

The Board disagreed with Voice Tech's proposed construction of ACI stating that this term "has its plain and ordinary meaning." Appx28. That "plain and ordinary meaning" was never provided. However, even simply looking at the actions required of the ACI in these claims, there is no evidence that Wong's speech engine performs all of these actions required of the ACI. In fact, the Board held that it was only the combination of Wong and Beauregard that teaches an ACI performing the deciding and selecting actions required in these claims. Appx33.

---

[12] Appx74.
[13] Appx74-75.

Yet, the Board also held that Wong's speech engine ***alone*** meets the plain and ordinary meaning of ACI. Appx28. Thus, one problem is that the Board has held that ACI should be construed to have its plain and ordinary meaning without any explanation of what that plain and ordinary meaning is. Then, the Board held that Wong's speech engine ***alone*** meets the plain and ordinary meaning of ACI despite its contradictory finding that the speech engine does not perform the deciding and selecting actions required of the ACI. Therefore, there is no substantial evidence to support the Board's holding that Wong's speech engine by itself meets the plain and ordinary meaning of ACI.

Unified also argued that even if Wong's speech engine is not an ACI, such is obvious over Wong in view of Beauregard's teachings related to MIKE 330. Appx103-104. It incorrectly asserted that a POSITA would have been motivated to modify "*Wong*'s speech engine to incorporate *Beauregard*'s more specific teachings related to the logic of an audio command interface (e.g., MIKE 330) ***for receiving audio data***." Appx107 (emphasis added). The Board agreed with Unified's incorrect assertion. Appx28.

In Beauregard, the user's speech is initially sent to a third-party software for speech-to-text translation. Appx1332, 14:5-12. Beauregard explains that although certain inputs such as keystrokes or mousestrokes may be forwarded to kernel 104, Appx1332, 13:45-53, voice signals are treated separately:

> Voice signals are treated separately since they require additional processing to convert to text, which is done using ***third-party voice-to-text software***. The ActiveWords system will capture the text characters from the voice-to-text software before it is provided to the application program **118**.

Appx1332, 14:5-10 (emphasis added). Thus, it is only after being received by the third-party voice-to-text software that the input may be forwarded to MIKE 330 as text—not audio data. Appx1333, 16:47-63. Therefore, the component MIKE 330 has nothing to teach regarding receiving audio data; Beauregard's MIKE 330 receives translated text instead.[14] Appx2897. In other words, a POSITA would not have looked to Beauregard's teachings related to MIKE 330 if the POSITA was considering modifying Wong's speech engine for receiving audio data. Appx2897-2898.

However, the Board held that when Wong's speech engine is modified to include Beauregard's logic to locate scripts the combination teaches accessing and controlling operating systems or applications without requiring voice command interoperability. Appx28. There are a couple of problems with this holding. For example, the reference to Beauregard's logic about locating scripts is the matching function wherein if a specific word macro is stated, a match is found in a database with specific instructions on what is supposed to occur. Appx1330, 10:5-8. This

[14] Beauregard does not indicate that MIKE 330 has control over the third-party speech-to-text software.

same matching function is also described in Wong, Appx1281-1283, [0040]-[0041], [0058], [0063], so there would be no motivation for a POSITA to seek out Beauregard for logic already disclosed in Wong. Appx2897-2898.

Another problem with the Board's holding is that it refers to the lack of requiring voice command interoperability, which is a part of Voice Tech's proposed construction for ACI—a proposed construction rejected by the Board, which simply held that ACI has its plain and ordinary meaning. Appx28. This plain and ordinary meaning was never provided. Based on the Board's holdings, that plain and ordinary meaning does not include all of the actual claim limitations for ACI as seen with the Board finding that Wong's speech engine alone meets the plain and ordinary meaning of ACI. *Id*. Further, it is unclear if the lack of voice command interoperability is a part of the "plain and ordinary meaning" of ACI. Thus, the Board failed to provide any useful guidance as to the plain and ordinary meaning of ACI.

Additionally, Voice Tech argued that there was no reason for a POSITA to look to Beauregard's teachings related to MIKE 330 for receiving audio data because Beauregard's MIKE 330 does not receive audio data. Appx2897. The Board acknowledged this argument, Appx28-29, but disagreed. Appx29. More specifically, the Board made the following statement:

> Petitioner does not propose modifying Wong's system to bodily incorporate MIKE 330. *See* Pet. 14-18. Instead, Petitioner proposes modifying Wong's speech engine 213 to allow it to select at least one operating system or at least one application in

> response to receiving an audio command based on Beauregard's teachings. *See* Pet. 15; *id*. at 14.

Appx29 (parentheticals omitted). Yet, the Board cites Unified's general discussion of motivation to combine rather than Unified's specific arguments. Unified argued that a POSITA would look to Beauregard's teachings ***related to receiving audio data*** to enhance Wong's speech engine. Appx107. Given there are no such teachings in Beauregard, that argument lacks merit.

Also, even looking at the general allegation of motivation to combine, there would be no point. Wong and Beauregard both require the user to preconfigure data in a database before the user can begin. Appx1281, [0035]; Appx1330, 9:22-23. Both Wong and Beauregard disclose speech-to-text translation, which Wong refers to as "parsing." Appx1282, [0045]. Beauregard employs a third-party software to perform this speech-to-text translation. Appx1332, 14:5-12. Finally, both Wong and Beauregard employ a matching function in order to match the command to the user's preconfigured instructions. Appx1281-1283, [0040]-[0041], [0058], [0063]; Appx1330, 10:5-8. So, there is no reason for a POSITA to seek to combine Wong and Beauregard given these overlapping functions. Appx2897-2898.

Thus, Wong's speech engine is not an ACI. Given that Beauregard's MIKE 330 does not receive audio data, it has nothing to teach Wong's speech engine about receiving audio data—or anything else for that matter. Therefore, there is no substantial evidence supporting the Board's finding that Unified demonstrated how

the combination of Wong and Beauregard teaches the "receiving/receives" limitations in claims 1, 3, 5, and 7. The Board erred in finding that Unified met its burden of proof, and the Board's decision finding that claims 1-8 are unpatentable should be reversed.

### C. The "Decodes" Elements

Claims 1, 3, 5, and 7 each contain a "decodes" element, as shown in the following table:

| | |
|---|---|
| Elements [1.2] and [3.2] | "the audio command interface decodes the audio data into a command;"[15] |
| Elements [5.4] and [7.4] | "the audio command interface…decodes the audio data into a command;"[16] |

Unified alleged that Wong, alone or in view of Beauregard, discloses, or at least renders obvious, these limitations. Appx107, Appx128, Appx131, Appx135. More specifically, Unified alleged that "Wong discloses, or at least renders obvious, that the audio command interface decodes the audio data into a command (e.g., by parsing the voice command)." Appx108, Appx128, Appx131, Appx135. Unified's sole support for this allegation was the following: "Wong discloses that after home PC translates speech into text, the speech recognition engine 213 (i.e., the audio command interface) 'is configured to **identify voice commands** and keywords' and

[15] Appx74.
[16] Appx74-75.

‘**parses the command**.’” Appx107 (citing Appx1281-1282, [0032], [0039], [0043]). Unified was wrong for several reasons.

For example, Wong does not support this statement. Appx2898. Wong’s speech engine 213, which is a part of the home PC, performs speech-to-text translation: “If the command is a voice command (‘Yes’ branch, block **402**), then the speech engine **213** parses the command at block **404**.” Appx1281, [0039]. In Wong, “parsing” is simply speech-to-text translation: “At block **422**, a voice command is detected by the smart phone **202** and the command is ***parsed (i.e. a speech to text translation is performed)*** by the smart phone **202** (block **424**).” Appx1282, [0045] (emphasis added). Therefore, Unified incorrectly suggested that the speech engine 213 is doing something beyond just speech-to-text translation. Appx2898-2899. Additionally, as explained above, Wong’s speech engine is not an audio command interface (“ACI”). *See supra* Section III(B).

Yet, the Board held that Unified demonstrated how the Wong/Beauregard combination teaches these “decodes” limitations. Appx29. The Board relied on statements in Wong referring to speech engine ***parsing*** audio data. Appx30. However, the Board ignored Wong’s definition of “parsed,” which is “a speech to text translation is performed.” Appx1282, [0045]. The Board focused instead on a statement in Wong referring to speech engine being configured to “***identify*** voice commands and keywords.” Appx30 (citing Appx1281, [0032], [0037]-[0039]).

There is no support, however, for the finding that "decoding" should be defined to mean "identifying." Further, the references cited by the Board indicate that the term "identify" is ***nothing more*** than speech-to-text translation. Wong explains that any known speech recognition engine may be employed, particularly those that do not require specific voice training. Appx1281, [0032]. Additionally, nothing in [0037]-[0039] of Wong suggests that speech engine 213 does anything other than speech-to-text translation. Appx1281, [0037]-[0039]. Therefore, the Board ignored Wong's clear definition of "parses" and instead defined it to mean "identifies."

The Board also found that Voice Tech's argument that Wong's speech engine translates audio data into text without identifying a command is based on an embodiment of Wong not relied on by Unified. The Board stated that Unified's argument relied on Wong's first embodiment in which speech recognition engine 213 on PC 210 identifies commands in voice data received from smart phone 202. Appx30 (citing Unified's references to Wong's Figure 4a). The Board then stated that, by contrast, Voice Tech's argument relied on Wong's second embodiment in which speech recognition module 240 on smart phone 202 performs text recognition on voice data at smart phone 202 and sends a text message to PC 210. Appx31 (citing references to Figure 4b).

Yet, the Board's finding that Voice Tech relied on a different embodiment than Unified is incorrect. This overlooks the fact that Voice Tech cited Wong's

[0045], which includes a discussion of Figure 4b, simply because that is one of the places where Wong defined "parses." Voice Tech did not specifically rely on Figure 4b as opposed to Figure 4a. With regard to Figure 4a, Wong explains that home PC 210 may perform speech-to-text translation. Appx1282, [0043]. After that statement, Wong explains that the same speech-to-text translation can be performed by a speech recognition module on the mobile device. Appx1282, [0044]. Thus, when Wong provides the definition of "parses," there is no difference in the meaning of that term just because the parsing may be performed in some instances on the home PC 210 or in other instances on the mobile device. Therefore, the Board overlooked the clearly defined meaning of "parsing" and instead incorrectly found that the speech engine, which only performs speech-to-text translation, performs decoding.

Unified alternatively argued that if Wong's speech engine is not an ACI that decodes the audio data, such is obvious over Wong in view of Beauregard's teachings related to MIKE 330. Appx108. It concluded that "*Beauregard* discloses that *the audio command interface* (e.g., MIKE 330) *decodes the audio command into a command* (e.g., by matching the audio data with a series of commands)." Appx109. This does not make sense. Appx2899.

Unified alleged that Wong's speech engine, which only performs speech-to-text translation, is the ACI. Thus, Unified was arguing that the term "decoding" refers to just speech-to-text translation. Appx2899. Then, Unified alternatively

alleged that Beauregard's fetcher, which is a part of MIKE 330, decodes the audio data by performing a matching function. Appx108. Thus, Unified was simultaneously arguing that the term "decoding" refers to the matching function. This does not make sense because the fetcher is not provided with audio data. Appx2899-2900; Appx1338, 25:17-18; Appx1339, 28:54-64. Instead, Beauregard discloses the audio data being sent to a third-party voice-to-text software, Appx1332, 14:5-12, and the translated text is sent to the fetcher. Appx1338, 25:17-18; Appx1339, 28:54-64. Thus, Beauregard does not disclose or teach an ACI that decodes audio data into a command. Appx2900.

The Board acknowledged this, but it stated that Voice Tech's argument did not dissuade it from finding that Unified had "demonstrated how *the combination* of Wong and Beauregard teaches the decoding limitation." Appx31. Yet, the fact is that Beauregard's MIKE 330 does not perform speech-to-text translation, which is performed by third-party software. Appx1332, 14:5-12. Beauregard's matching function does not disclose or teach decoding. Beauregard focuses on word macros, Appx1327, 3:10-19, and it requires the user to first set up action words by preconfiguring a database. Appx1330, 9:22-23. Later, the user speaks into a microphone, the spoken utterance is translated into text by a third-party, and the fetcher compares the translated text to the preconfigured database looking for a match. Appx1338, 25:17-18. Yet, the fetcher, which performs the matching function,

never receives audio data, so it cannot decode audio data. *Id*. Further, there is no command output from the fetcher. It merely looks for a match between the translated text and the preconfigured action words, which then leads to the user's preconfigured instructions being carried out. Appx1330, 10:5-8. Additionally, there is no need to decode any audio data into a command because the instructions have already been preconfigured by the user. Appx3119-3120.

Further, despite Unified's incorrect assertion that performing a command in Beauregard is based on the translated text, Appx594, in reality, the action to be carried out is based on the user's preconfigured instructions. Appx1330, 10:5-8. Also, Beauregard does not disclose selecting an operating system or application; Beauregard simply discloses following a user's preconfigured instructions located in a database. *Id*., Appx2904-2905. The user decides what operating system or application may be employed when the user sets up the system. *Id*.

Ultimately, the Board's holdings are not supported by substantial evidence. Wong includes a speech engine for speech-to-text translation, Appx1282, [0045], and the photo application performs a matching function. Appx1281-1283, [0040], [0041], [0058], [0063]. Beauregard discloses the use of a third-party voice-to-command software to perform its speech-to-text translation. Appx1332, 14:5-12. If Beauregard does not even disclose or teach its own speech-to-text software, a POSITA would not have been motivated to combine Beauregard's teachings related

to the fetcher and command interpreter with Wong's speech engine. Appx2900-2901. Further, Wong already discloses the photo application performing the matching function that Beauregard has the fetcher performing. Thus, Wong and Beauregard both disclose speech-to-text translation followed by a matching function. *Id*. Therefore, there is no reason for a POSITA to be motivated to combine Beauregard's matching function into Wong's speech engine. *Id*. Additionally, MIKE 330 does not receive audio data; it receives translated text. Appx1338, 25:17-18; Appx1339, 28:54-64.

Therefore, Wong does not, either alone or in view of Beauregard, disclose or render obvious the "decodes" limitations. Appx2901. Thus, the Board's holdings as to Elements [1.2], [3.2], [5.4], and [7.4] should be reversed because they are not supported by substantial evidence.

**D. The "Deciding/Selecting" Elements**

Claims 1, 3, 5, and 7 each contain a "deciding/selecting" element, as shown in the following table:

| | |
|---|---|
| Element [1.3] | "the audio command interface ***selects***, from at least one operating system and at least one application, one operating system or one application, wherein the audio command interface ***decides*** is the appropriate operating system or application to execute at least one process in response to the command;"[17] |
| Element [3.3] | "the audio command interface ***selects***, from two or more applications, one application, wherein the audio command |

[17] Appx74 (emphasis added).

| | |
|---|---|
| | interface ***decides*** is the appropriate application to execute at least one process in response to the command;”[18] |
| Element [5.5] | “the audio command interface…***selects***, from at least one operating system and at least one application, one operating system or one application, wherein the audio command interface ***decides*** is the appropriate operating system or application to execute at least one process in response to the command;”[19] |
| Element [7.5] | “the audio command interface…***selects***, from two or more applications, one application, wherein the audio command interface ***decides*** is the appropriate application to execute at least one process in response to the command;”[20] |

Unified asserted that Beauregard discloses, or at least renders obvious, these limitations. Appx110, Appx128-129, Appx131, Appx135. It referred to Beauregard’s MIKE 330 retrieving a service script. Appx110-111. It then referred to the disclosure of MIKE 330, which it contended ***matches*** audio data with service scripts.[21] *Id*. Finally, Unified concluded that “Beauregard discloses, or at least renders obvious, that *the audio command interface* (e.g., MIKE 330) *selects, from at least one operating system* (e.g., Windows 95) *and at least one application* (e.g., Windows Application(s) 118), *one operating system or one application, wherein the audio command interface decides is the appropriate operating system or application*

[18] *Id*. (emphasis added).
[19] *Id*. (emphasis added).
[20] Appx75 (emphasis added).
[21] As established above, MIKE 330 never receives audio data. It only receives translated text from a third-party voice-to-text software. Appx1332, 14:5-12; Appx1338, 25:17-18; Appx1339, 28:54-64.

*to execute at least one process in response to the command* (e.g., based on the commands contained in the service scripts corresponding to the audio commands received).” Appx111-112. This argument reveals a misunderstanding of Beauregard.

Beauregard discloses the creation of customized voice macros. Appx1327, 3:10-19. The user must configure the system because all action words are defined by the user. Appx1330, 9:22-23. After configuring the database (wordbase), the user speaks one of the voice macros into the microphone. Appx1333, 16:60-62. The voice macro is translated from speech to text by a third-party software, Appx1332, 14:5-12, and the text is sent to the fetcher to perform the matching function. Appx1338, 25:17-18; Appx1339, 28:54-64. Each of the user’s database entries contains a service script, which are user instructions to follow when a match is found. Appx1334, 17:38-41. These instructions determine what action (macro) will be performed when a match is found. Appx1330, 10:5-8. Thus, in Beauregard, the user configures the system and provides the instructions on what occurs when a match is found. Appx2902-2903. It is the user that decides what action will occur: “If an action word is entered, the ActiveWord system takes whatever action the user has specified (i.e., each action word has at least one associated action therewith) for that action word.” Appx1330, 10:5-8. As explained in Beauregard, “[t]he service script will navigate to the appropriate tool or context and perform designated action.” Appx1331, 11:22-24.

Thus, the user configures the system. Appx2904-2905. The user sets up the action words or voice macros, and it is the user that provides the instructions or service scripts for when a particular voice macro is spoken. *Id*. The user controls all of these activities by preconfiguring the system with specific instructions. *Id*. There is nothing in Beauregard disclosing or teaching a component that decides the appropriate operating system or application to execute at least one process in response to the command and then selects, from at least one operating system and at least one application, one operating system or one application. *Id*.

Unified also asserted that "a POSITA would have been motivated to modify *Wong*'s similar system including a speech engine and keyword database to incorporate *Beauregard*'s teachings related to logic capable of interpreting natural-language voice commands to select from a database (e.g., wordbase) capturing commands for many services one of a computer operating system and multiple applications from any context." Appx112. This assertion is wrong.

Wong and Beauregard are both systems where the user preconfigures the database with specific instructions to be carried out when a command is given. Appx1281, [0035]; Appx1330, 9:22-23. Wong uses its speech engine for speech-to-text translation, Appx1282, [0045], whereas Beauregard uses a third-party speech-to-text translation software. Appx1332, 14:5-12. Wong and Beauregard both employ a matching function with a database to locate the user's preconfigured instructions

or service scripts, which tell the computer exactly what to do. Appx1281-1283, [0040]-[0041], [0058], [0063]; Appx1330, 10:5-8. Both references do the same thing; they disclose and teach systems where the user preconfigures the system. Appx2905-2906. Neither discloses an audio command interface ("ACI"). *Id*. Thus, there is no reason why a POSITA would seek to modify Wong with any teachings from Beauregard. *Id*.

In its Petition, Unified failed to address the key "deciding" limitations in these elements. In its Reply, Unified argued for the first time that the "deciding" limitation may be disclosed or taught by the user's preconfigured instructions. Appx598. This assertion ignored the claim language and mischaracterized the specification. Unfortunately, the Board based its decision on this incorrect construction of "deciding." Appx34.

In the first excerpt cited by Unified, Appx71, 3:55-59, the discussion is about determining "whether voice data corresponds to an audio command." This discussion is related to the "decoding" step in which an ACI decodes audio data into a command. Appx3121-3122. Thus, it does not describe the "deciding" step in a separate element. *Id*. The second and third excerpts cited by Unified have the same problem. Appx3122. The second excerpt addresses matching voice data with commands, and the third excerpt discusses voice to command conversion—both describing the "decoding" step. Appx71, 4:7-15; Appx72, 6:7-10.

Further, the claims include limitations wherein an ACI decides which operating system or application is appropriate to execute at least one process. Appx74-75. In Wong and Beauregard, the alleged ACIs do not decide what will be the appropriate operating system or application. Appx3123. In fact, the alleged ACIs have no choice but to follow the user's preconfigured instructions. *Id*. If a user speaks a preconfigured word, the systems match the preconfigured word to an entry in a database, and the user's preconfigured instructions are followed. *Id*. There is nothing to indicate in Wong or Beauregard that the alleged ACIs may decide between operating systems or applications.[22] *Id*.

Thus, Wong does not, either alone or in view of Beauregard, disclose, or render obvious, these limitations. Appx2906. Therefore, the Board's holdings as to Elements [1.3], [3.3], [5.5], [7.5], should be reversed because they are not supported by substantial evidence.

### E. Unified Relied on Hindsight Reasoning

In its Petition, Unified succumbed to hindsight bias in its obviousness analysis when it failed to address why a POSITA ***at the time of the invention***, June 4, 2007,[23] would have been motivated to combine Wong and Beauregard. This type of

---

[22] Unified also improperly attempted to define the term "deciding" through its expert's reply declaration, Appx2736-2743, ignoring the legal standards for claim construction.

[23] Appx66.

"hindsight analysis is inappropriate because obviousness must be assessed at the time the invention was made." *InTouch*, 751 F.3d at 1352.

Unified's argument regarding motivation to combine Wong and Beauregard makes absolutely no reference as to why a POSITA ***at the time of the invention*** would have been motivated to combine Wong and Beauregard. Appx94-98, Appx107, Appx109, Appx112, Appx116-119, Appx121, Appx127, Appx130. Thus, Unified completely failed to argue or submit any evidence to support why a POSITA ***at the time of the invention*** would have been motivated to combine Wong and Beauregard.

In Reply, Unified incorrectly argued that it was enough to merely point out that the priority date was 2007 and that it can simply be assumed that all of the motivation to combine discussions were as of that date. Appx601. There is no support for that argument.

In *InTouch*, the patent owner challenged a district court's judgment finding certain patent claims invalid. *InTouch,* 751 F.3d at 1346-1347. This Court stated that a "patent is invalid for obviousness 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *Id*. at 1347 (quoting 35 U.S.C. §103).

This Court then pointed out that the district court found that the alleged infringer's expert, Dr. Yanco, had "provided several detailed explanations and reasons as to why a person of ordinary skill in the art might be motivated to combine references regarding remotely controlled robots, telepresence robots, and teleconferencing protocols." *Id*. at 1348. The district court also found that the patent owner's expert testimony was "weak and of little relevance," as well as contradicted by Dr. Yanco's "clear expert testimony." *Id*.

On appeal, the patent owner argued that Dr. Yanco's expert testimony was "replete with errors" because she "applied an incorrect legal standard." *Id*. More specifically, the patent owner asserted that Dr. Yanco had "failed to identify any reason why one of ordinary skill in the art at the time of the invention would have sought to combine or modify the references." *Id*.

This Court agreed with the patent owner and found that "Dr. Yanco's testimony was plagued by numerous problems, including her failure to…(2) focus on the relevant time frame of 2001." *InTouch*, 751 F.3d at 1348. This Court held that Dr. Yanco "succumbed to hindsight bias in her obviousness analysis." *Id*. at 1352. Dr. Yanco "failed to address why one of ordinary skill in the art *at the time of the invention*, which was 2001, would be motivated to combine these references." *Id*. This Court also pointed out that "[n]ot once during Dr. Yanco's direct examination regarding the '357 patent did she analyze what one of skill in the art would have

understood as of 2001; that is the relevant inquiry." *Id*. That was one of the main reasons why this Court reversed the district court's judgment of invalidity. *Id*. at 1353.

In its Final Written Decision, the Board agreed with Unified. Appx24. The Board pointed to two excerpts in McNair's Declaration in which he stated that he had been ***informed*** of the legal standards for obviousness. Appx24 (citing Appx1220-1221). Yet, even though McNair may have been informed about these standards, he still failed to address why a POSITA ***at the time of the invention*** would have been motivated to combine Wong and Beauregard. Despite this failure, however, the Board found that McNair's testimony was sufficient and then criticized Voice Tech's approach as being too rigid. Appx24-25. The Board also held that this Court's discussion and analysis in *InTouch* regarding Dr. Yanco's impermissible hindsight is merely "*dicta* predicated on the assumption that the prior art had in fact disclosed the claim element the Federal Circuit found to be missing." Appx25.

Voice Tech respectfully disagrees with the Board's understanding of *InTouch*. This Court's lengthy discussion of Dr. Yanco's testimony made it clear that her impermissible hindsight was one of three major failures in her testimony. *InTouch*, 751 F.3d at 1348. This Court discussed Dr. Yanco's problem of impermissible hindsight in detail. *Id*. at 1352. There is no indication that the discussion of her impermissible hindsight is "unnecessary to the decision in the case, and therefore,

not precedential (though [they] may be considered persuasive)." *Co-Steel Raritan, Inc. v. International Trade Com'n*, 357 F.3d 1294, 1307 (Fed. Cir. 2004) (defining "dicta").

Here, Unified submitted no evidence regarding why a POSITA ***at the time of the invention***, June 4, 2007, would have been motivated to combine Wong and Beauregard. The burden of proof was on Unified to establish unpatentability by a preponderance of the evidence, *Cuozzo*, 136 S.Ct. at 2144, and it failed to do so as to claims 1-8. Therefore, Unified's motivation to combine arguments succumbed to hindsight bias, and the Board's decision finding claims 1-8 unpatentable should be reversed.

## CONCLUSION

For all the foregoing reasons, the Court should reverse the Board's holding that claims 1-8 of the '679 patent are unpatentable.

Dated: December 16, 2022

Respectfully submitted,

/s/ Eric M. Adams
Eric M. Adams
eadams@tumeyllp.com
TUMEY L.L.P.
5177 Richmond Avenue, Suite 1188
Houston, Texas 77056
(713) 622-7005
(713) 622-0220 *fax*

ATTORNEYS FOR APPELLANT
VOICE TECH CORP.

# ADDENDUM

# INDEX FOR ADDENDUM


| Tab | Document | Appx No. |
|---|---|---|
| 1 | Final Written Decision | Appx1 |
| 2 | Denial of Rehearing Request | Appx51 |
| 3 | U.S. Patent No. 10,491,679 | Appx66 |

Trials@uspto.gov
571-272-7822

Paper: 46
Date: December 13, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

UNIFIED PATENTS, LLC,
Petitioner,

v.

VOICE TECH CORPORATION,
Patent Owner.

---

IPR2020-01018
Patent 10,491,679 B2

---

Before GEORGIANNA W. BRADEN, JOHN F. HORVATH, and MICHAEL T. CYGAN, *Administrative Patent Judges.*

HORVATH, *Administrative Patent Judge.*

# JUDGMENT
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Unified Patents, LLC ("Petitioner"), filed a Petition requesting *inter partes* review of claims 1–8 ("the challenged claims") of U.S. Patent No. 10,491,679 B2 (Ex. 1001, "the '679 patent"). Paper 1 ("Pet."), 2. Voice Tech Corporation ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). Upon consideration of the Petition and Preliminary Response, we instituted *inter partes* review of all challenged claims on all grounds raised. Paper 10 ("Dec. Inst.").

Patent Owner filed confidential (Paper 16) and public (Paper 17) versions of a Response to the Petition. *See* Paper 17 ("PO Resp.").[1] Petitioner filed confidential (Paper 28) and public (Paper 30) versions of a Reply. *See* Paper 30 ("Pet. Reply"). Patent Owner filed confidential (Paper 34) and public (Paper 35) versions of a Sur-Reply, which included argument relying on evidence (Exhibits 2038–2041) other than the deposition transcripts of the cross-examination of a Reply witness. *See* Paper 35 ("PO Sur-Reply");

Petitioner moved to strike Exhibits 2038–2041 as against Board policy and to deny consideration of those portions of the Sur-Reply that rely on these Exhibits. *See* Paper 39, 1; *see also* Patent Trial and Appeal Board Consolidated Trial Practice Guide at 73 (Nov. 2019)[2] ("The sur-reply may not be accompanied by new evidence other than the deposition transcripts of the cross-examination of any reply witness."). Patent Owner opposed. *See* Paper 40. We granted Petitioner's motion, and expunged Exhibits 2038–

---

[1] Unless noted otherwise, we cite to the public versions of the papers filed by the parties.
[2] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated

2041 from the record. Paper 43, 6. We do not consider and give no weight to any arguments first presented in Patent Owner's Sur-Reply that rely on any of Exhibits 2038–2041. An oral hearing was held on September 21, 2021, and the hearing transcript is included in the record. *See* Paper 45 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b). This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, we find Petitioner has demonstrated by a preponderance of evidence that claims 1–8 of the '679 patent are unpatentable.

### *B. Related Matters*

Petitioner and Patent Owner identify the following as a matter that can affect or be affected by this proceeding: *Voice Tech Corp. v. Mycroft AI Inc.*, 4:20-cv-00111 (W.D. Mo.). Pet. 96; Paper 6, 2. In addition, Patent Owner identifies U.S. Patent No. 9,794,348 as a patent and U.S. Patent Application Nos. 16/655,047; 16/655,054; 16/655,061; 16/677,351; 16/677,332; 16/677,369; 16/710,539; 16/710,692; 16/896,673; 16/896,693; and 16/896,743 as patent applications that can affect or be affected by this proceeding. Prelim. Resp. 1.

### *C. Evidence Relied Upon*[3]

| Reference | | Effective Date | Exhibit |
|---|---|---|---|
| Wong | US 2006/0235700 A1 | Oct. 19, 2006 | 1004 |
| Beauregard | US 6,438,545 B1 | Aug. 20, 2002 | 1005 |
| Ben-Efraim | US 7,203,721 B1 | Apr. 10, 2007 | 1006 |
| Balakrishnan | US 6,233,559 B1 | May 15, 2001 | 1007 |

[3] Petitioner also relies upon the Declarations of Bruce McNair (Exs. 1003, 1032) and Kevin Jakel (Ex. 1028).

### *D. Instituted Challenges to Patentability*

We instituted review on the following challenges:

| Ground | Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|---|
| 1 | 1–8 | 103(a) | Wong, Beauregard |
| 2 | 1–8 | 103(a) | Ben-Efraim, Balakrishnan |

## II. ANALYSIS

### *A. Real Parties-in-Interest*

Petitioner and Patent Owner identify themselves, respectively, as the only real parties-in-interest. Pet. 96; Paper 6, 2.

Patent Owner disagrees that Petitioner is the only real party-in-interest, arguing that "one of Petitioner's subscription members, Mycroft AI Inc. ('Mycroft') is also an RPI," basing that argument on an analysis of the factors set forth in *RPX Corporation v. Applications In Internet Time, LLC*, IPR2015-01750, Paper 128 at 2 (Oct. 2, 2020 PTAB) (precedential). *See* PO Resp. 12, 16–22. Specifically, Patent Owner argues Mycroft is an unnamed RPI because (1) Unified's business model is to invalidate or license patents on behalf of its members, (2) Mycroft had a preexisting "membership" relationship with Unified prior to the filing of the Petition, (3) Unified knew Mycroft had been sued for infringement of the '679 patent when it filed the Petition, and refused to discuss the Petition with Mycroft in a "willfull[y] blind[]" effort to avoid having to name Mycroft as an RPI, (4) Mycroft wants to have the '679 patent found unpatentable, and stands to gain if it is found unpatentable, (5) Unified and Mycroft exchanged communications before the Petition was filed, and (6) Unified is representing Mycroft's interest in seeking to have the '679 patent found unpatentable. *Id.* at 16–22.

Patent Owner, therefore, "asks that this IPR be terminated due to Petitioner's failure to identify all RPIs." *Id.* at 23; *see also* PO Sur-Reply 2–14.

Petitioner replies that "[t]he Board need not address whether a party is an unnamed RPI, as no time bar or estoppel provisions under 35 U.S.C. § 315 are implicated." Pet. Reply 15 (citing *SharkNinja Operating LLC v. iRobot Corp.*, IPR2020-00734, Paper 11 at 18 (Oct. 6, 2020, PTAB) (precedential). Petitioner further argues that Mycroft is not an RPI because Petitioner (1) deters assertions of invalid patents by non-practicing entities without coordinating with its members, (2) never acts as a middleman for its members, discusses lawsuits with its members, or helps extricate its members from lawsuits, (3) can and has challenged its own member's patents, (4) has never been paid by Mycroft, (5) decided to challenge the '679 patent and hired a prior art search firm and expert witness to help challenge the '679 patent before Mycroft became a member, (6) engaged in limited communications with Mycroft to explain that it does not coordinate with its members and would not be working on Mycroft's behalf, (7) acts at its own behest and has sole control, discretion, and funding over this proceeding, and (8) has no incentive, financial or otherwise, to represent Mycroft's interests in this proceeding. *Id.* at 16–26.

For the following reasons, and without deciding whether Mycroft is an unnamed RPI, we are not persuaded by Patent Owner's argument that this proceeding should be terminated for failure to identify all RPIs. First, Patent Owner's argument is based on an incorrect premise that 35 U.S.C. § 312(a) is a jurisdictional statute that must be satisfied to give the Board jurisdiction. This premise is contrary to the Board's precedential decision in *Lumentum Holdings, Inc. v. Capella Photonics, Inc.*, IPR2015-00739, Paper 38, 5 (PTAB Mar. 4, 2016) (precedential) ("§ 312(a) is not jurisdictional").

*Lumentum* makes clear that § 312(a) is not jurisdictional because a party may rectify non-compliance with the statute. *Id.*, Paper 38 at 5. The Federal Circuit has upheld the Board's finding that § 312(a) is not jurisdictional. *See Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1240 (Fed. Cir. 2019) ("[I]f a petition fails to identify all real parties in interest under § 312(a)(2), the Director can, and does, allow the petitioner to add a real party in interest.").

Second, the facts in *RPX* are clearly distinguishable from the facts in this case. In *RPX*, the Board's analysis was limited to determining "whether the § 315(b) time-barred entity Salesforce should have been identified as an RPI or privy." *RPX*, Paper 128, 7. Upon finding "RPX ha[d] not shown, by a preponderance of the evidence, that Salesforce was not an RPI," the Board terminated RPX's petition as also time-barred under § 315(b). *Id.* at 35. Here, by contrast, the evidence establishes that Mycroft was not a time-barred party when Unified filed the Petition. *See* Tr. 34:4–10 (counsel for Patent Owner admitting Mycroft was not time-barred based on the filing of the Texas infringement complaint); *see also* Ex. 2034 (showing Mycroft was sued in Missouri on March 22, 2020); Pet. 99 (showing the Petition was filed on June 5, 2020); 35 U.S.C. § 315(b) (setting forth the 1 year time-bar, i.e, March 22, 2021 based on the filing date of the Missouri complaint and assuming immediate service of the complaint). Consequently, even if we were to determine that Mycroft is an RPI of Unified, there is no basis to deny or terminate the Petition under § 315(b), which is not implicated.

Moreover, estoppel under § 315(e) only arises after "a final written decision under section 318(a)" has issued with respect to a challenged claim. *See* 35 U.S.C. §§ 315(e)(1),(2). This decision will be the first such final written decision as to any claim of the '679 patent. Thus, even if we were to

determine that Mycroft is an unnamed RPI, § 315(e)(1) would prevent Mycroft from requesting a *future* proceeding challenging a claim at issue in this proceeding on a basis that has been raised or reasonably could have been raised in this proceeding, but does not require termination of this proceeding. It will be left to the sound judgment of the District Court for the Western District of Missouri to determine whether Mycroft is estopped under § 315(e)(2) from challenging the validity of any claim challenged in this proceeding on a basis that has been raised or reasonably could have been raised in this proceeding.

Accordingly, because we determine that neither the time bar nor estoppel provisions of 35 U.S.C. § 315 are implicated in this case, "we need not address whether [Mycroft] is an unnamed RPI." *SharkNinja*, Paper 11 at 18.

### *B. The '679 Patent*

The '679 patent is directed to a system and method "for using voice commands from a mobile device to remotely access and control a computer." Ex. 1001, 1:30–34. The system includes mobile device 102, which can be "a cellular phone, smart phone, touch-screen device, personal digital assistant, tablet device, notebook device, laptop device, or other suitable mobile device." *Id.* at 2:31–35. The system also includes general purpose computer 104 having "mobile device interface 106, audio command interface 108, operating system interface 110, and native applications 112." *Id.* at 2:38–43.

"Mobile device interface 106 receives voice or data information from mobile device 102," "perform[s] voice recognition and other suitable processing," and "provide[s] voice data to audio command interface 108." *Id.* at 3:13–14, 3:51–54. To do so, mobile device interface 106 "monitor[s]

communications medium 114," such as a public switched telephone network (PSTN), local area network, digital subscriber line (DSL) or cable modem, or other suitable network connections, and "determine[s] whether mobile device 102 has transmitted data to general purpose computer 104." *Id.* at 3:14–32.

Audio command interface 108 "receive[s] data from mobile device interface 106 and detect[s] audio commands in the data." *Id.* at 3:46–48. Audio command interface 108 can "provide a list of available commands to the person using mobile device 102" and execute detected commands. *Id.* at 3:59–62. Audio command interface 108 can have "one or more states, such that certain audio commands are available depending upon the state of audio command interface 108." *Id.* at 3:65–4:1.

"Operating system interface 110 allows audio command interface 108 to activate various operating system commands" such as "a search command, a run command, [or] a program list command." *Id.* at 4:7–9, 6:35–39. Native applications 112, i.e., applications that can be "accessed and controlled at general purpose computer 104," can be interfaced with audio command interface 108 "by installing an applications program interface (API) or other suitable data into audio command interface 108 that identifies native applications 112 and provides available commands for audio command interface 108 to interface with native applications 112." *Id.* at 4:26–43.

Figure 4 of the '679 patent, reproduced below, illustrates a method "for using voice commands from a mobile device to remotely access and control a general purpose computer." *Id.* at 7:50–53.




Figure 4 of the '679 patent is a flow chart "for using voice commands from a mobile device to remotely access and control a general purpose computer." *Id.* The method begins at 402/404 "where a call is received from a mobile device" and "a session is established with the mobile device." *Id.* at 7:53–55, 7:61. "At 406, it is determined whether a voice or data command has been received," and if so, the method "proceeds to 410," where "the voice or data command is decoded." *Id.* at 8:10–11, 8:23–25. "At 412, it is determined whether the command is an operating system command," and if it is, the method "proceeds to 414 where the operating system command is executed." *Id.* at 8:32–36. If the received command is not an operating

system command, the method "proceeds to 416 where it is determined whether a native application command has been received," and if so, "the method then proceeds to 418 where the command is executed." *Id.* at 9:39–42, 9:46–49. Otherwise, "the method proceeds to 420 where an error message is generated." *Id.* at 9:50–52.

Regardless of whether an operating system or native application command is executed at steps 414 or 418, respectively, "[a]t 422, the audio output data, video output data, or audio and video output data, generated at the computer is converted to a mobile device format." *Id.* at 8:61–63. At 424, the converted data is then "transmitted to the mobile device." *Id.* at 9:11–13. "The method then proceeds to 426," where "it is determined whether a response has been received from the mobile device." *Id.* at 9:26–29. "If no response has been received, the method proceeds to 428 and terminates." *Id.* at 9:29–30. Conversely, if a response is received, "the method then returns to 406." *Id.* at 9:37–38.

### *C. Illustrative Claim*

Claims 1, 3, 5, and 7 are independent claims, and claims 2, 4, 6, and 8, respectively, depend from them. Ex. 1001, 10:7–12:16. Claim 1 is illustrative of the challenged claims and is reproduced below.

> 1. A method of accessing and controlling a computer from a mobile device, comprising:
>
> receiving audio data from the mobile device, at the computer, at an audio command interface;
>
> the audio command interface decodes the audio data into a command;
>
> the audio command interface selects, from at least one operating system and at least one application, one operating system or one application, wherein the audio command interface decides is the appropriate operating system or

> application to execute at least one process in response to the command;
>
> executing with the selected operating system or application the at least one process in response to the command;
>
> generating output data in response to the selected operating system or application executing the at least one process; and
>
> transmitting the output data to the mobile advice.

Ex. 1001, 10:7–25.

### *D. Level of Ordinary Skill in the Art*

Petitioner identifies a person of skill in the art ("POSITA") at the time of the invention as someone that would have had "at least a bachelor's degree in electrical engineering, computer science, or a related subject or the equivalent or closely-related field . . . , and one or more years of experience working with audio input systems." Pet. 8 (citing Ex. 1003 ¶¶ 29–31). Patent Owner does not dispute Petitioner's description of the educational requirements of a person of ordinary skill in the art, but argues the field of invention is "computer operating systems, and more specifically . . . using voice commands from a mobile device to remotely access and control a computer." PO Resp. 3–4. Therefore, Patent Owner argues, a person skilled in the art "would need at least 5 years of experience working on actual implementations of the above disciplines in industry, government, and/or academia." *Id.* at 4 (emphasis omitted).

"[T]he level of skill in the art is a prism or lens through which a judge, jury, or the Board views the prior art and the claimed invention." *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The level of skill in the art should be commensurate with the problems and solutions disclosed in the prior art. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). For the reasons discussed in § II.F.3, *infra*, we find the field of invention is voice

activated computing. Accordingly, we determine a person of ordinary skill in the art would have had a bachelor's degree in electrical engineering, computer science, or a related field, and three years of experience working on voice activated computing.

### *E. Claim Construction*

In *inter partes* reviews, we interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under that standard, the "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The ordinary and customary meaning of a claim term applies "unless the patentee demonstrated an intent to deviate from [it] . . . by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Thus, although we "look to the specification and prosecution history to interpret what a patentee meant by a word or phrase in a claim," we do not read "extraneous limitations . . . into the claims from the specification or prosecution history" absent an express definition or clear disavowal of claim scope. *Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002). Only those claim terms in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Petitioner avers that because "the claims are obvious under any reasonable construction . . . no claim requires construction beyond its plain

meaning." Pet. 8. Patent Owner argues the terms "audio command interface" and "mobile device interface" require construction. *See* PO Resp. 4–12.

*1. Audio Command Interface*

Patent Owner argues this limitation should be construed to mean:

> [A] functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables a mobile device to access and control one or more operating systems and/or one or more applications at the computer without requiring voice command interoperability between the mobile device and each separate operating system or application.

PO Resp. 6. Patent Owner argues its proposed construction is supported by the Specification, prosecution history, and a dictionary definition of "interface." *Id.* at 7–9 (quoting Ex. 1001, 2:38–45, 4:45–57, 7:36–49; Ex. 1008, 379–380, 476–492; Ex. 2002, 193; citing Ex. 2013 ¶ 45).[4]

Petitioner replies that Patent Owner's construction (a) improperly reads limitations from the rest of the claim into the audio command interface, (b) cites to portions of the Specification that either do not describe the audio command interface or that describe exemplary embodiments, and (c) cites to a prosecution history that failed to limit the meaning or disavow claim scope for an audio command interface. Pet. Reply 2.

We agree with Petitioner. Neither the Specification nor the prosecution history defines or limits the plain and ordinary meaning of an audio command interface; nor do any of the passages cited by Patent Owner.

[4] Patent Owner cites to pages 476–492 of Exhibit 1002. *See* PO Resp. 9; Ex. 1002. The subject matter Patent Owner describes, however, can be found in Exhibit 1008, the prosecution history of the parent to the '679 patent. *See* Ex. 1008, 476–492. We correct the citation here.

*See* PO Resp. 7–9 (citing/quoting Ex. 1001, 2:38–45, 4:45–57, 7:36–49). Although the Specification describes audio command interface 108 as a component of system 100 "implemented in hardware, software, or a suitable combination of hardware and software," system 100 is an "exemplary" embodiment rather than a limiting embodiment. Ex. 1001, 2:21–24, 2:38–45. In any event, all computer components can be implemented as hardware, software or suitable combinations of hardware and software.

Similarly, although the Specification distinguishes system 100 over prior art systems requiring "voice command interoperability," it does not identify audio command interface 108 as the component that distinguishes system 100 over the prior art. *Id.* at 4:45–57. Regardless, as discussed above, system 100 is described as an "exemplary" rather than a limiting embodiment. *Id.* at 2:21–24. Moreover, contrary to Patent Owner's contention, the prosecution history did not limit the plain and ordinary meaning of an audio command interface. *See* PO Resp. 9. Although the applicant amended claims to recite an audio command interface and argued the audio command interface eliminated the need for "voice command interoperability," the amended claims were subsequently abandoned after further rejection by the Examiner. *See* Ex. 1008, 477–486 (amending claims 1–12 to recite an audio command interface); *id.* at 416 (continued rejection of claims 1–12), *id.* at 304 (cancellation of claims 1–12).

Finally, although the Specification discloses "system 300 provides an audio command interface that allows a person to use voice commands from mobile device 102 to access and control native applications or operating system functions," it does not limit the audio command interface to one that receives voice commands from a mobile device. Ex. 1001, 7:36–49. First, like system 100, system 300 is an "exemplary" rather than a limiting

embodiment. *Id.* at 5:62–64. Second, all of the independent claims *expressly* require the audio command interface to receive data from a mobile device. *Id.* at 10:9–10, 10:32–33, 10:55–57, 11:15–17. This strongly suggests the audio command interface is not limited to receiving data from a mobile device. *See Phillips*, 415 F.3d at 1314 (explaining that "the context in which a term is used in the asserted claim can be highly instructive," for example, a claim referring to steel baffles "strongly implies that the term 'baffles' does not inherently mean objects made of steel."); *see also Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant."). Third, the Specification discloses the audio command interface can receive data from non-mobile devices. For example, it discloses "audio command interface 108 receives data from mobile device interface 106," which includes network interface 202, which "can monitor a modem, such as a PSTN modem, cable modem, DSL modem, or other suitable modems for incoming data traffic that indicates mobile device 102 *or other suitable devices* are attempting to interface with general purpose computer 104." Ex. 1001, 3:45–48, 4:64–67, 5:8–14, Fig. 2 (emphasis added).

Accordingly, for all of the reasons discussed above, we find the term "audio command interface" has its plain and ordinary meaning and does not require express construction.

*2. Mobile Device Interface*

Patent Owner argues this limitation should be construed to mean "a functional component of a computer, which may be implemented in hardware, software, or a suitable combination of hardware and software, that enables the computer to communicate with a mobile device through an

appropriate communications medium." PO Resp. 10. Patent Owner argues this construction is supported by the Specification and a dictionary definition of "interface." *Id.* at 10–12 (quoting/citing Ex. 1001, 2:1–3, 3:13–43, 4:64–5:5; 5:20–52, Fig. 2; Ex. 2002, 193; Ex. 2013 ¶ 46). Petitioner argues this limitation does not need construction, but "agrees that P[atent] O[wner's] construction is reasonable." Pet. Reply 2. Patent Owner responds that because the meaning of this term "is not immediately apparent," it requires express construction. PO Sur-Reply 2 (citing Ex. 2013 ¶ 46).

In the institution phase, we preliminarily agreed with and adopted Patent Owner's construction of this term as our own. *See* Dec. Inst. 11. However, as noted above, the Specification discloses mobile device interface 106 can monitor a network interface card or "a PSTN modem, cable modem, DSL modem, or other suitable modems for incoming data traffic that indicates mobile device 102 or *other suitable devices* are attempting to interface with general purpose computer 104." Ex. 1001, 4:64–67, 5:8–14, Fig. 2 (emphasis added). Thus, a mobile device interface is not limited to an interface between a computer and a mobile device. Regardless, because our Decision does not depend on the precise meaning of this term, we construe mobile device interface to *include* hardware, software, or a combination thereof that enables communication between a computer and a mobile device. *See Nidec*, 868 F.3d at 1017.

### *F. Obviousness over Wong and Beuaregard*

Petitioner argues claims 1–8 are unpatentable as obvious over Wong and Beauregard. Pet. 9–55. Patent Owner disagrees. PO Resp. 28–49. For the reasons discussed below, Petitioner has established by a preponderance of evidence that claims 1–8 are unpatentable over Wong and Beauregard.

*1. Wong*

Wong discloses a system and method allowing "mobile electronic device users to access and manipulate collections of electronic files stored on a computer from their mobile device using voice commands." Ex. 1004 ¶ 12. Wong's method is illustrated in Figures 3 and 4a. Figure 3 is reproduced below.




Figure 3 of Wong is a flow chart illustrating an exemplary method for using a mobile device to process electronic files. *Id.* ¶ 34. At steps 302/304, photo server application 220 on PC (personal computer) 210 creates keyword database 225 and index 227 for stored digital photos 224. *Id.* ¶ 35, Figs. 2, 3. At steps 306–310, photo server application 220 monitors

Internet 208 for a connection request from smart phone 202 and, upon receiving a request, authenticates smart phone 202. *Id.* ¶¶ 35–36, Figs. 2, 3. At step 312, photo server application 220 receives one or more commands from smart phone 202; these can include commands to "send[] a list of keywords to the device, send[] a particular photo to the device, [or] store a voice recording . . . about a particular photo" in database 225. *Id.* ¶ 37. The commands can be "voice commands or commands related through . . . key strokes, mouse inputs, stylus inputs, etc." *Id.* ¶ 38. At step 314, "PC 210 executes the commands received at block 312 and transmits data and/or files to the [smart phone] device (or some other device) as required by the received command." *Id.* ¶ 41.

As indicated above, the command received at step 312 may be a voice command. *Id.* ¶ 38. If so, the command is processed according to the method depicted in Figure 4a of Wong, which is reproduced below.




Figure 4a of Wong is a flow chart illustrating audio command processing by PC 210. *Id.* At steps 402/404, speech engine 213 in PC 210 determines whether a received command is a voice command and, if it is, parses the

command to identify a command word and a keyword. *Id.* ¶¶ 38–39, Figs. 2, 4a. At steps 406–412, PC 210 or photo server application 220 searches keyword database 225 "to identify a match with the parsed command." *Id.* ¶ 39. "If a matching keyword is found . . . then the command is executed at block 412 (which is, in effect, block 314 of FIG. 3)," and PC 210 "transmits data and/or files to the [smart phone] device (or some other device) as required by the received command." *Id.* ¶¶ 40–41.

*2. Beauregard*

Beauregard discloses "[a] system and method that allows a user to use their everyday language or user defined words to operate a computer in a highly efficient way." Ex. 1005, code (57). Beauregard's system includes a microkernel engine or MIKE 330, which is shown in Figure 4, reproduced below.




Figure 4 of Beauregard is block diagram showing a detailed view of Beauregard's MIKE 330. *Id.* at 28:18. At user input 310, a user can enter

input via a keyboard, mouse selection, or microphone. *Id.* at 16:47–62. If the user input is entered via microphone, the input is converted into text via conventional voice-to-text software. *Id.* at 14:5–8. The generated text is provided to command interpreter 430 via AW services 460. *Id. at* 28:65–29:1. Command interpreter 430 sends the text to fetcher 420, which searches wordbase 340 for matching action words. *Id.* at 28:56–64. Wordbase 340 is a repository "where all third party applications register their set of action words" and associated scripts. *Id.* at 17:24–36. The scripts contain one or more "commands [that] can range from a simple word replacement to a call to an application program." *Id.* at 30:3–5. When fetcher 420 finds a matching action word in wordbase 340, it sends the script associated with that action word to command interpreter 430, which executes the script. *Id.* at 5:40–46, 29:9–14. The script can be a command service that "causes an operation to be performed by a software application, a utility program, or by the operating system." *Id.* at 28:11–13.

*3. Whether Wong and Beauregard are Combinable*

Petitioner argues Wong and Beauregard are combinable because they are in the same field of endeavor, namely, "systems and methods of accessing and controlling a computer using voice commands." Pet. 13–14 (citing Ex. 1003 ¶¶ 51, 61; Ex. 1004 ¶¶ 12, 33, 68; Ex. 1005, 5:19–22). Patent Owner disagrees, arguing the teachings of Wong and Beauregard cannot be combined because Beauregard is not analogous art. PO Resp. 45–48. Patent Owner argues the field of endeavor of the '679 patent is "using voice commands from a mobile device to remotely access and control a computer" and that Beauregard is not in this field of endeavor because it uses a microphone to enter voice commands and "does not disclose or teach anything related to mobile devices." *Id. at* 46–48. Patent Owner further

argues that Beauregard is not reasonably pertinent to a problem confronting the inventor of the ’679 patent because it “has nothing to do with the problems involved in the use of voice commands from a mobile device to access and control a computer.” *Id.* at 48–49.

A reference is analogous art if it is (a) “within the field of the inventor’s endeavor” or (b) “reasonably pertinent to the particular problem with which the inventor was involved.” *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986). The field of endeavor is determined “by reference to explanations of the invention’s subject matter in the patent application, including the embodiments, function, and structure of the claimed invention.” *In re Bigio*, 381 F.3d 1320, 1325–26 (Fed. Cir. 2004). A reference is within an inventor’s field of endeavor when it has “essentially the same function and structure” as the claimed invention. *Deminski*, 796 F.2d at 442. A reference is reasonably pertinent to a problem the inventor was involved with if it “logically would have commended itself to an inventor’s attention in considering his problem.” *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992). The scope of analogous art is to be construed broadly. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (indicating *KSR*[5] “directs us to construe the scope of analogous art broadly”).

The ’679 patent identifies its field of invention as “computer operating systems” or “using voice commands from a mobile device to remotely access and control a computer.” Ex. 1001, 1:7–12. The mobile device can be a “laptop . . . or other suitable mobile device that allows communication with a computer via a wireless or wire-line network.” *Id. at* 2:31–36, 2:62–

[5] *KSR Int’l Co. v. Teleflex, Inc.*, 550 U.S. 398, 402 (2007)

65, Fig. 1. Figure 4 of the ’679 patent illustrates a method “for using voice commands from a mobile device to remotely access and control a general purpose computer.” *Id.* at 7:50–52. All steps of the method are performed by computer 104, which receives a call from a mobile device (step 402) by monitoring a network interface card or a modem connected to a wired communications medium for incoming data from a cell phone, tablet, laptop, or *other suitable devices*. *Id.* at 2:31–37, 2:62–3:2, 3:18–32, 4:64–5:16, 5:8–17, 7:53–9:65, Fig. 4. The incoming data need not be received from a cellular phone or over a wireless network. Accordingly, the field of endeavor of the ’679 patent is voice activated computing. *See Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016) (finding the field of endeavor “is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field”).

Wong discloses “voice activated mobile computing devices” and “processing files from mobile computing device using voice commands.” Ex. 1004 ¶ 2. Wong’s method allows “mobile electronic device users to access and manipulate collections of electronic files stored on a computer [PC 210] from the mobile device using voice commands.” *Id.* ¶ 12. Thus, like the ’679 patent, Wong’s field of endeavor is voice activated computing.

Beauregard discloses a semantic user interface (SUI) for a computer that allows a user to access the computer via a set of user defined words. Ex. 1005, 1:11–16. The SUI allows a user “to enter action words and interact with the system to control the operations of the computer.” *Id.* at 5:14–16. The action words can be entered by voice, in which case “voice-to-text software is provided to translate the voice signals.” *Id.* at 8:36–40. Thus, like Wong and the ’679 patent, Beauregard’s field of

invention is also voice activated computing. Alternatively, because Beauregard discloses converting voice signals into action words to control a computer, Beauregard is reasonably pertinent to the invention claimed in the ’679 patent and would have “commended itself to [the] inventor’s attention in considering his problem.” *Clay*, 966 F.2d at 659.

Accordingly, for the reasons discussed above, we find Wong and Beauregard are analogous art and, therefore, would have been combinable.

*4. Reasons to Combine Wong and Beauregard*

Petitioner argues that a person of ordinary skill in the art would have found it obvious “to incorporate *Beauregard’s* teachings related to using natural-language commands . . . to select the appropriate operating system functionality or application to execute the command into *Wong’s* system.” Pet. 14 (citing Ex. 1003 ¶¶ 62–69). Petitioner argues this would entail modifying Wong “to implement *Beauregard’s* teachings related to controlling an operating system and applications using natural-language commands using one or more components of MIKE 330 to access a database mapping such commands.” *Id.* at 15 (citing Ex. 1003 ¶ 64). Petitioner argues this modification of Wong “would have simply required the application of known techniques . . . to improve a similar device . . . in the same way” because both Wong and Beauregard “are related to executing voice commands using keyword matching.” *Id.*

Patent Owner does not dispute Petitioner’s rationale for combining the teachings of Wong and Beauregard. *See* PO Resp. 57–60. Instead, Patent Owner argues that Petitioner’s reasoning suffers from hindsight bias because Petitioner “failed to address why one of ordinary skill ***at the time of the invention*** . . . would be motivated to combine Wong and Beauregard.” *Id.* at 57 (citing *InTouch Techs., Inc. v. VGO Commc’ns, Inc.*, 751 F3d 1327,

1352 (Fed. Cir. 2014)). Patent Owner also argues that Petitioner's obviousness analysis fails because "Petitioner failed to consider, or even mention, any objective evidence of nonobviousness in its Petition." *Id.* at 60.

Petitioner replies that any reasonable person would understand its reasons to combine Wong and Beauregard were provided as of June 4, 2007, because the Petition identified that date as the priority date of the '679 patent and its expert described the qualifications of a person of ordinary skill in the art as of that date. Pet. Reply 13–14 (citing Pet. 1, 14–18, Ex. 1003 ¶¶ 29–31). Petitioner further argues that it did not need to consider secondary considerations because Patent Owner "provided no evidence of secondary indicia of nonobviousness for Petitioner to consider." *Id.* at 14 (citing *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

We find Petitioner has articulated sufficient reasoning with rational underpinning to demonstrate why a person of ordinary skill in the art would have been motivated to combine the teachings of Wong and Beauregard at the time of the invention. Petitioner's analysis relies on and cites the declaration of Mr. McNair. *See* Pet. 14–18 (citing Ex. 1003 ¶¶ 62–69). Mr. McNair testifies that he had been informed "that a person cannot obtain a patent . . . if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art . . . at the time of the invention." Ex. 1003 ¶ 12. Mr. McNair further testifies that he had been informed "that for a patent claim to be found obvious, the proper perspective to consider is that of a person having ordinary skill in the art . . . at the time of the invention." *Id.* ¶ 14. Based on this testimony, we conclude that Petitioner's reasoning for why a person skilled in the art would have combined the teachings of

Wong and Beauregard pertain to why that person would have done so at the time of the invention. *Id.* ¶¶ 62–66. To find otherwise would be to adhere to a "[r]igid preventative rule[] that den[ies] factfinders recourse to common sense," which the Supreme Court found is "neither necessary under our case law nor consistent with it." *KSR*, 550 U.S. at 421.

The *InTouch* decision does not dissuade us from reaching this conclusion. The Federal Circuit's holding in *InTouch* was "that there [was] no evidence, much less substantial evidence, from which the jury could conclude that [the prior art] disclose[d] [a claimed element], notwithstanding [the expert's] conclusory opinion to the contrary." *InTouch*, 751 F.3d at 1351. The Federal Circuit's other findings in *InTouch*, upon which Patent Owner relies, are *dicta* predicated on the assumption that the prior art had in fact disclosed the claim element the Federal Circuit found to be missing. *Id.* ("Even assuming [the prior art] disclosed the [missing claim element] there is insufficient evidence on this record of a reason or motivation for one of ordinary skill in the art at the time of the invention to combine [the prior art].").

Moreover, the dicta in *InTouch* are not particularly relevant given the particular facts in this case. First, the Federal Circuit faulted the *InTouch* expert for failing "to provide the necessary 'articulated reasoning with some rational underpinning' to support a conclusion of invalidity based on the[] combinations" of references asserted in that case. *Id.* (quoting *KSR*, 550 U.S. at 418). By contrast, Mr. McNair has opined that a person of ordinary skill in the art would have modified Wong to use Beauregard's database in order to control multiple applications or the operating system because doing so amounted to applying "known techniques . . . to improve a similar device . . . in the same way." Pet. 15 (citing Ex. 1003 ¶ 64). The Supreme Court

has expressly endorsed this type of reasoning. *See KSR*, 550 U.S. at 417 ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill").

Second, the Federal Circuit faulted the *InTouch* expert for failing "to address why one of ordinary skill in the art *at the time of the invention* . . . would be motivated to combine these references." *InTouch*, 751 F.3d at 1352. By contrast, Mr. McNair's opinions regarding combining the teachings of Wong and Beauregard are made with the understanding that "the obviousness inquiry should be done through the eyes of a person having ordinary skill in the art *at the time of the invention*," and that "the proper perspective to consider is that of a person having ordinary skill in the art . . . *at the time of the alleged invention*." Ex. 1003 ¶¶ 12, 14, 63–64 (emphases added).

Third, the Federal Circuit faulted the *InTouch* expert for failing "to account for objective evidence of nonobviousness" that had been introduced by the patentee in that case. *InTouch*, 751 F.3d at 1348, 1352. By contrast, Patent Owner has not introduced any evidence of secondary considerations of nonobviousness in this case despite bearing the burden of producing such evidence. *See* PO Resp. 1–60; PO Sur-Reply 1–25; *see also GPAC*, 57 F.3d at 1580; *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) (placing burden on the opponent of invalidity to come forward with evidence to counter evidence of invalidity); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000) (placing burden on patentee to introduce object indicia of non-obviousness). Accordingly, there was no secondary considerations evidence for Petitioner or its expert to consider.

5. *Claim 1*

a) *Receiving audio data from a mobile device at a computer's audio command interface*

Claim 1 recites a method of accessing and controlling a computer from a mobile device, comprising receiving audio data from the mobile device, at the computer, at an audio command interface. Ex. 1001, 10:7–10.

Notwithstanding Patent Owner's arguments to the contrary, discussed *infra*, Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 18–27. First, Petitioner demonstrates how Wong discloses an audio command interface that receives audio data from a mobile device. *See* Pet. 18–23 (citing Ex. 1004 ¶¶ 12, 25, 30–33, 37–39, 43, Figs. 2, 3, 4a; Ex. 1003 ¶ 69). Wong discloses "a way for mobile electronic device users to access and manipulate collections of electronic files stored on a computer" by receiving voice commands sent from mobile device 202 at speech engine 213 in PC 210 in order to control application 220. Ex. 1004 ¶¶ 12, 32, Figs. 2, 3, 4a. Second, for the reasons discussion in § II.F.4, *supra*, Petitioner demonstrates why a person skilled in the art "would have been motivated to modify, and would have reasonably expected success in modifying, *Wong's* speech engine to incorporate *Beauregard's* more specific teaches related to the logic of an audio command interface (e.g., MIKE 330)." Pet. 27.

Patent Owner argues Wong's speech engine is not an audio command interface because it (a) "merely performs speech-to-text translation" and (b) "does not enable a mobile device to access and control one or more operating systems and/or one or more applications . . . without requiring voice command interoperability between the mobile device and each separate operating system or application" (i.e., it doesn't meet Patent

Owner's proposed construction of the term "audio command interface"). *See* PO Resp. 31–32. We disagree.

First, for the reasons discussed in § II.E.1, *supra*, we disagree with Patent Owner's proposed construction of the term "audio command interface," and find the term has its plain and ordinary meaning. Second, we find Wong's speech recognition engine 213 meets that plain and ordinary meaning because it is an interface between smart phone 202 and application 220 that receives a command from smart phone 202 (Figure 3, step 312) and "parses the command" (Figure 4a, step 404) in order to "identify voice commands and keywords" that can be executed to control operation of application 220. Ex. 1004 ¶¶ 32, 39, 41, Figs. 2, 3, 4a.

Moreover, when Wong's speech engine 213 is modified to include Beauregard's logic to locate scripts associated with commands and to execute the scripts in order "to launch [] application program(s) 118 or to control functions and features of application program(s) 118," the combination teaches accessing and controlling one or more operating systems or applications without requiring voice command interoperability. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("[T]he test [for obviousness] is whether the references, taken as a whole, would have suggested appellant's invention to one or ordinary skill in the . . . arts at the time the invention was made. . . . Thus, [Wong] must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole.").

Patent Owner further argues that the audio command interface limitation is not met because a person skilled in the art "would not have looked to Beauregard's teachings related to MIKE 330 if the [person] was considering modifying Wong's speech engine for receiving audio data"

because Beauregard's MIKE 330 receives text recognized by third-party voice recognition software and "has nothing to teach regarding receiving audio data." PO Resp. 32–33. We disagree.

Petitioner does not propose modifying Wong's system to bodily incorporate MIKE 330. *See* Pet. 14–18. Instead, Petitioner proposes modifying Wong's speech engine 213 to allow it to select at least one operating system or at least one application in response to receiving an audio command based on Beauregard's teachings. *See* Pet. 15 (arguing a person skilled in the art "would have been motivated to modify *Wong's* system to implement *Beauregard's* teachings related to controlling an operating system and applications using natural-language commands using one or more components of MIKE 330 to access a database mapping such commands"); *id.* at 14 (arguing that when "[c]ombined with *Beauregard's* teachings, *Wong's* speech engine would include logic . . . to access a database, like *Beauregard's* wordbase, that maps voice input to commands for various operating system and application functions, as opposed to a database dedicated to a single application."). "Non-obviousness cannot be established by attacking references individually where the [challenge] is based upon the teachings of a combination of references." *Merck*, 800 F.2d at 1097.

*b) decoding the audio data into a command at the audio command interface*

Claim 1 requires the audio command interface to decode the audio data into a command. Ex. 1001, 10:11–12. Notwithstanding Patent Owner's arguments to the contrary, discussed *infra*, Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 27–29 (citing Ex. 1003 ¶¶ 49, 55–59, 63–69). First, Petitioner demonstrates

how Wong's speech recognition engine 213 decodes received audio data into a command. *Id.* at 27–28 (citing Ex. 1004 ¶¶ 25, 32, 39, 43, Fig. 4a). Wong discloses PC 210 receives voice commands from smart phone 202 and speech recognition engine 213 "parses the command[s]" in order to "identify voice commands and keywords." Ex. 1004 ¶¶ 32, 37–39. Second, Petitioner demonstrates how Beauregard's MIKE 330 includes logic for recognizing a command from received audio data that has been converted into text. *See* Pet. 28–29 (citing Ex. 1005, 28:58–29:12, 30:1–7, Fig. 4). Beauregard discloses converting voice data to text, and providing the text to MIKE 330's command interpreter 430. Ex. 1005 28:65–29:1, Fig. 4. Command interpreter 430 passes the text to fetcher 420, which searches wordbase 340 for matching action words. *Id.* at 28:56–59. If a matching action word is found, fetcher 420 sends a script associated with the action word back to command interpreter 430. *Id.* at *29:9–12*.

Patent Owner argues this limitation is not met because Wong's speech recognition engine "parses" audio data (i.e., performs simple speech-to-text translation) rather than decoding the audio data into a command. PO Resp. 34–35 (citing Ex. 1004 ¶ 45). We disagree.

First, Wong *expressly* discloses "speech recognition engine 213 [] is configured to *identify* voice commands and keywords." Ex. 1004 ¶ 32 (emphasis added). Second, Patent Owner's argument that Wong's speech engine translates audio data into text without identify a command is based on an embodiment of Wong that Petitioner *does not* rely on. Petitioner's argument relies on Wong's first embodiment in which speech recognition engine 213 on PC 210 identifies commands in voice data received from smart phone 202. *See* Pet. 27–28 (citing Ex. 1004 ¶¶ 25, 32, 39, 43, Fig. 4a); *see also* Ex. 1004 ¶ 43 (describing Figure 4a as depicting an embodiment

that "records a voice command at the mobile device and downloads the voice command to the home PC 210 as an audio note"). By contrast, Patent Owner's argument relies on Wong's second embodiment in which speech recognition module 240 on smart phone 202 performs text recognition on voice data at smart phone 202 and sends a text message to PC 210. *See* PO Resp. 35 (quoting Ex. 1004 ¶ 45); *see also* Ex. 1004 ¶ 45 ("FIG. 4b is a flow diagram 220 that depicts an exemplary command processing technique performed on a mobile device.")

Patent Owner further argues that the decoding limitation isn't met because "Beauregard discloses the audio data being sent to a third-party voice-to-text software . . . and the translated text [being] sent to the fetcher." PO Resp. 37. Therefore, Patent Owner argues, "Beauregard does not disclose or teach an audio command interface that decodes audio data into a command.

Patent Owner's argument does not dissuade us from finding that Petitioner has demonstrated how *the combination* of Wong and Beauregard teaches the decoding limitation. As discussed in § II.F.5.a, *supra,* Petitioner identifies Wong's speech engine 213 as an audio command interface and proposes modifying speech engine 213 to include logic from Beauregard's MIKE 330 to allow it to identify commands for at least one operating system and at least one application, i.e., to identify commands for operating systems and applications in addition to Wong's application 220. "Non-obviousness cannot be established by attacking references individually where the [challenge] is based upon the teachings of a combination of references." *Merck*, 800 F.2d at 1097.

*c) selecting an operating system or application to execute a process in response to the command at the audio command interface*

Claim 1 further requires the audio command interface to select one operating system or one application from at least one operating system and at least one application that the audio command interface decides is the appropriate operating system or application to execute at least one process in response to the command. Ex. 1001, 10:13–18. Notwithstanding Patent Owner's arguments to the contrary, discussed *infra*, Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 29–32 (citing Ex. 1005, 5:42–46, 9:5–26, 10:12–21, 10:41–65, 16:41–46, 17:37–41, 27:47–28:16, Figs. 4, 10; Ex. 1003 ¶¶ 63–69).

As discussed above, Wong's speech recognition engine 213 is an audio command interface that receives audio data from a mobile device and decodes the audio data into a command. *See* Ex. 1004 ¶¶ 12, 32, 39, Figs. 2, 3, 4a. Wong then searches keyword database 225 "to identify a match with the parsed command" (Figure 4a, step 406) and executes the command to control application 220 upon finding a match (Figure 4a, step 412). *Id.* ¶¶ 40–41, Figs. 2, 4a.

Beauregard stores a plurality of user-defined action words in a database (wordbase 340) together with service scripts associated with the action words. Ex. 1005, 5:12–26, 5:39–42, 17:33–36, Fig. 4. User input 310 entered into a microphone is converted to text that is forwarded to command interpreter 430 inside MIKE 330. *Id.* at 15:60–63, 28:65–29:5. Command interpreter 430 forwards the input to fetcher 420, which searches wordbase 340 for matching action words and their associated service scripts. *Id.* at 9:17–20, 28:56–64. When a match is found, fetcher 420 sends the service script associated with the action word to command interpreter 430,

which executes the script. *Id.* at 5:44–46, 29:9–14, 16:41–46. The service script may perform "a content, retrieval, navigation or command service." *Id.* at 5:42–44, 17:37–41. A content service "alters the user's text content in some way," e.g., by "automatically capitalizing the first letter of proper nouns." *Id.* at 27:53–58. A command service "causes an operation to be performed by a software application, a utility program, or by the operating system (e.g., opening a word processing document)." *Id.* at 28:11–14. The scripts that can be executed by command interpreter 430 allow users "to launch applications, navigate within applications and control application functions by using their natural language." *Id.* at 5:49–51, 9:22–26, 10:41–44.

Petitioner argues that a person skilled in the art would have found it obvious to modify Wong's system, including speech recognition engine 213 and keyword database 225, "to incorporate *Beauregard's* teachings related to logic capable of interpreting natural-language voice commands to select from a database (e.g., wordbase [340])" commands to control a variety of services, including commands for the operating system and multiple applications. Pet. 32 (citing Ex. 1003 ¶¶ 63–69). We agree for the reasons discussed in § II.F.4, *supra*. Thus, the combination of Wong and Beauregard teaches an audio command interface that selects an operating system or application to execute a process in response to a received command that the audio command interface decides is the appropriate operating system or application to execute the process.

Patent Owner argues the combination of Wong and Beauregard fails to disclose the selecting limitation. *See* PO Resp. 39–44. Patent Owner argues that "Wong and Beauregard are both systems where the user preconfigures [a] database with specific instructions to be carried out when a

command is given" and "employ a matching function with a database to locate the user's preconfigured instructions or service scripts, which tell the computer exactly what to do." *Id.* at 43. Therefore, Patent Owner argues, because the user "preconfigures the system with specific instructions," the combination fails to teach or suggest "a component that decides the appropriate operating system or application to execute at least one process in response to the command and then selects, from at least one operating system and at least one application, one operating system or one application." *Id.* at 42.

Petitioner responds that the selecting limitation "do[es] not prohibit preconfiguration" of the computer to respond to commands and that a person skilled in the art "would have understood that . . . computer systems 'decide' to perform operations based on preconfigured instructions." Pet. Reply 10 (citing Ex. 1032 ¶¶ 7–13). Petitioner further responds that, like its proposed combination, the '679 patent "teaches an audio command interface that 'can determine whether voice data corresponds to one of two or more predetermined audio commands' and may include a 'file of available commands' that 'can be matched with voice data.'" *Id.* (quoting Ex. 1001, 3:55–59, 4:7–15, 6:7–10) (emphasis omitted).

We agree with Petitioner. First, we credit the testimony of Mr. McNair that a person skilled in the art at the time of the invention would have known that computers "decide" which operations to perform based on preconfigured instructions. *See* Ex. 1032 ¶ 7. Second, the audio command interface described in the '679 patent operates in the same way as the audio command interface in Petitioner's proposed combination, i.e., by recognizing and executing predetermined commands. For example, the '679 patent discloses "audio command interface 108 can determine whether voice

data corresponds to one of two or more *predetermined* audio commands." Ex. 1001, 3:55–59 (emphasis added); *see also id.* at 6:7–10, Fig. 3 (disclosing audio command interface 108 includes voice to command conversion 302, which "receives voice data and determines whether the voice data matches one or more *predetermined* commands") (emphasis added). To recognize predetermined commands for the operating system, audio command interface 108 "*include[s] a file of available operating system commands*." *Id. at* 4:7–11 (emphasis added). To recognize predetermined commands for applications, native applications 112 install "an applications program interface (API) or other suitable data into audio command interface 108 that identifies native applications 112" and provides "*certain predetermined commands for native applications 112*." *Id.* at 4:26–36 (emphasis added).

*d) Executing with the selected operating system or application the process in response to the command*

Claim 1 further requires executing the at least one process with the selected operating system or application. Ex. 1001, 10:19–21. Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 32–37 (citing/quoting Ex. 1004 ¶¶ 33, 37, 40, 41, Figs. 2, 3, 4a; Ex. 1005, 5:42–46, 8:36–47, 9:5–26, 15:49–51, 17:33–36, 18:8–12, 18:45–57). Patent Owner does not dispute these contentions. *See* PO Resp. 28–49.

Wong's speech engine 213 parses received audio data to identify a command. Ex. 1004 ¶¶ 32, 39, Fig. 4a. Wong then searches a database to identify and execute a matching command. *Id.* ¶ 40. When Wong's speech engine 213 is modified to include logic from Beauregard's MIKE 330 to search Beauregard's wordbase 340, the modified speech engine can include

Beauregard's fetcher 420 and command interpreter 430. Fetcher 420 receives text corresponding to an action word (command), searches wordbase 340 for a matching action word and, when a matching action word is found, sends an associated service script to command interpreter 430, which executes the service script. Ex. 1005, 5:44–46, 16:41–45, 17:21–22, 17:33–36, 28:65–29:14. The service script can "launch[] application programs, control[] application program operations, replace[] . . . text, retriev[e] . . . information, and the like." *Id.* at 9:5–12.

*e) Generating output data in response to executing the process*

Claim 1 further requires generating output data in response to the selected operating system or application executing the at least one process. Ex. 1001, 10:22–24. Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 37–39 (citing/quoting Ex. 1004 ¶¶ 37, 41, 54, 55, 68; Ex. 1005, 10:32–40, 10:58–65, 41:9–18, 46:25–30, 48:53–65). Patent Owner does not dispute these contentions. *See* PO Resp. 28–49.

Wong teaches when PC 210 executes voice commands received from a mobile device, it "transmits data and/or files to the device . . . as required by the received commands." Ex. 1004 ¶ 41. When Wong's speech engine 213 is modified to include logic from Beauregard's MIKE 330 (e.g., command interpreter 430 as discussed above), command interpreter 430 can execute a service script and "send[] all keyboard related actions (replacements, special keys, and the like) associated with [the] fetched action words . . . to the applications 118." Ex. 1005, 10:22–40, 29:13–17. Thus, the combination of Wong and Beauregard teaches generating output data in response to the selected operating system or application executing the process.

*f) Transmitting the output to the mobile device*

Claim 1 further requires transmitting the output data to the mobile device. Ex. 1001, 10:25. Petitioner demonstrates how the combination of Wong and Beauregard teaches this limitation. *See* Pet. 39–41 (citing/ quoting Ex. 1004 ¶¶ 41, 68, Fig. 3; Ex. 1003 ¶¶ 63–68). Patent Owner does not dispute these contentions. *See* PO Resp. 28–49.

Wong teaches when PC 210 executes voice commands received from a mobile device, it "transmits data and/or files to the device . . . as required by the received commands" over a GPRS[6] network. Ex. 1004 ¶¶ 41, 68. Thus, Petitioner demonstrates that when Wong's system is modified to incorporate the teachings of Beauregard, "[t]he combined system would generate output data. . . and transmit the data to the mobile device." Pet. 41.

*g) Conclusion*

For the reasons discussed above, Petitioner has demonstrated by a preponderance of evidence that all of the limitations of claim 1 are taught by the combination of Wong and Beauregard and that a person of ordinary skill in the art would have had a rational reason to combine the teachings from these references at the time of the invention. Accordingly, Petitioner has demonstrated by a preponderance of evidence that claim 1 is unpatentable over Wong and Beauregard.

*6. Claim 3*

Claim 3 recites a method that is substantially similar to the method recited in claim 1. *Compare* Ex. 1001, 10:30–45, *with id.* at 10:7–25. The method of claim 3 differs from the method of claim 1 in the types of entities the audio command interface can select in response to a received command.

[6] General Packet Radio Service, e.g., a 2G or 3G cellular network.

In claim 1, the audio command interface can select an operating system or an application from among at least one operating system and at least one application. *Id.* at 10:13–18. In claim 3, the audio command interface can select an application from among two or more applications. *Id.* at 10:36–40.

Notwithstanding Patent Owner's arguments to the contrary, discussed *infra*, Petitioner demonstrates how the combination of Wong and Beauregard teaches all the limitations of claim 3. *See* Pet. 48–50. First, given the substantial similarity between claims 1 and 3, Petitioner demonstrates how the combination teaches the claim 3 limitations requiring a method of controlling a computer from a mobile device by receiving audio data at an audio command interface, decoding the audio data into a command, executing the command with a selected application, generating output data, and transmitting the output data to the mobile device by relying on its analysis of claim 1. *See* Pet. 48; §§ II.F.5.a, II.F.5.b, and II.F.5.d–f, *supra*.

Second, Petitioner demonstrates how the combination teaches the audio command interface selects an application from among two or more applications that the audio command interface decides is the appropriate application to execute a process in response to the received command. *See* Pet. 49–50 (quoting Ex. 1005, 16:31–46; citing Ex. 1003 ¶¶ 63–69). Beauregard teaches using action words to "control functions and features of application program(s) 118. Each function is performed by a service script, which is associated with each action word within the wordbase 340." Ex. 1005, 16:41–46. Application programs 118 can include "word processors, spread sheets, presentation software, utilities, and the like." *Id.* at 16:36–38. Thus, a user might use action words such as "msw" "to launch Microsoft Word, 'mse' to launch Microsoft Excel, 'msp' to launch

Microsoft Powerpoint, 'msa' to launch Microsoft Access, and so on." *Id.* at 16:23–26. When Wong's speech recognition engine is modified to include these teachings from Beauregard, it can select an application from among two or more applications (MS Word, MS Excel) that it decides is the appropriate application to execute a process in response to a received command.

Patent Owner argues Petitioner's analysis fails for the same reasons discussed above with respect to claim 1. *See* PO Resp. 33, 34, 38, 44, 45. We disagree for the reasons discussion in §§ II.F.5.a–f, *supra*.

Accordingly, for the reasons discussed above, Petitioner has demonstrated by a preponderance of evidence that claim 3 is unpatentable over Wong and Beauregard.

*7. Claims 5 and 7*

Claims 5 and 7 are independent claims. Petitioner argues "[c]laim 5 is substantively similar to claims 1 and 2. Therefore, these limitations are obvious for the same reasons as the corresponding limitations in claims 1 and 2." Pet. 50. Likewise, Petitioner argues "[c]laim 7 is substantively similar to claims 1, 3, and 5. The corresponding limitations of [c]laims 1, 3, and 5 . . . show how each limitation of claim 7 is disclosed." *Id.* at 54. In our Institution Decision, we agreed with this analysis, and characterized claims 5 and 7 as system claims that perform the methods recited in claims 1 and 3, respectively. *See* Dec. Inst. 25.

Patent Owner disagrees that the limitations recited in claims 1 and 3 are substantially similar to the limitations recited in claims 5 and 7, respectively. *See* PO Resp. 23–27. First, Patent Owner argues the audio command interface recited in claims 5 and 7 differs from the audio command interface recited in claims 1 and 3 because it performs the

additional steps of "executing" and "generating." *Id.* at 26. Second, Patent Owner argues that claims 5 and 7 recite a "mobile device interface" for transmitting output data and Petitioner failed to mention the "mobile device interface" and, therefore, "failed to raise arguments or submit evidence that the 'mobile device interface' limitation would have been obvious." *Id.* at 23–25 (citing Pet. 52, 55; *Elbit Systems of America, LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1357–58 (Fed. Cir. 2018); *Choirock Contents Factory Co., Ltd. v. Saucier*, 801 Fed. Appx. 754 (Fed. Cir. 2020)).

Although we agree with Patent Owner that claims 5 and 7 recite an audio command interface that performs "executing" and "generating" steps, Petitioner's mapping of the Wong/Beauregard combination to the limitations of claims 1 and 3, respectively, demonstrates how the combination's audio command interface performs these "executing" and "generating" limitations. For example, Petitioner's claim 1 analysis demonstrates how the Wong/Beauregard audio command interface—i.e., Wong's speech engine 213 modified to include logic from Beauregard's MIKE 330—"executes with the selected operating system or application the at least one process . . . in response to the command" because once speech engine 213 identifies a command from audio data, fetcher 420 searches wordbase 340 for a matching command, and command interpreter 430 executes a script associated with that command, which causes an application or the operating system to execute a process. *See* Pet. 32–37; § II.F.5.d, *supra*.

Similarly, Petitioner's claim 1 analysis demonstrates how the Wong/Beauregard audio command interface "generates output data in response to the selected operating system or application executing the at least one process" because when command interpreter 430 executes a script it "sends all keyboard related actions (replacements, special keys, and the like)

associated with [the] fetched action words . . . to the applications 118." Ex. 1005, 10:22–40, 29:13–17. Thus, Wong's modified speech engine 213 and a selected operating system or application generate output data in response to the selected application or operating system executing a process. *See*, e.g., Pet. 31 (citing Ex. 1005, 19:13–20:10) (explaining how command interpreter 430 can "execut[e] a service script at the operating system to search a file directory in Windows 95"); Ex. 1006, 20:6–10 (indicating when such a script is executed it "erases the last word type[d]—activates the winstart key—types the letter 'f' that triggers the windows find tool—closes the winstart key—waits for 600 ms—and calls in the last word typed—and presses enter to launch the find operation").

Petitioner's claim 3 analysis demonstrates how the Wong/Beauregard audio command interface performs the "executing" and "generating" functions recited in claim 7 for the same reasons discussed above with respect to claims 1 and 5. *See* § II.F.6, *supra.*

Regarding the "mobile device interface" limitation recited in claims 5 and 7, Petitioner's tables that cross-reference claim 5 and 7 limitations to the analysis of corresponding claim 1 and 3 limitations recite only the function performed by the mobile device interface limitation (i.e., "transmitting output data to the mobile device") and omit the structure that performs that function (i.e., the "mobile device interface"). *See* Pet. 52, 55; Ex. 1001, 10:25, 11:4–5, 12:11–12. Petitioner contends that after noting the substantial similarity between claims 1 and 5 and claims 3 and 7, respectively, it referenced its claim 1 analysis of the "transmitting" limitation to show how the last limitation in claims 5 and 7 was "obvious for the same reasons." Pet. Reply 2–3 (citing Pet. 50, 51, 54, 90, 94). Petitioner then argues that its claim 1 analysis of the "transmitting" limitation

explained how a person skilled in the art would have known that Wong's computer would have used "built-in services of the computer operating system . . . to provide means to transmit output data to other . . . devices," and how these built-in services meet Patent Owner's construction of a "mobile device interface." *Id.* at 3 (citing/quoting Pet. 39, 41; Ex. 1003 ¶¶ 63–68; Dec. Inst. 26–27).

Patent Owner contends this argument is an improper new argument that is based on the Board's Institution Decision rather than the Petition, and that the Board "does not have the authority 'to raise, address, and decide patentability theories never presented by the petitioner and not supported by record evidence.'" PO Sur-Reply 14–15 (quoting *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016).

We disagree, and find Petitioner has demonstrated how the combination of Wong and Beauregard teaches the mobile device interface limitation recited in claims 5 and 7. Although Petitioner's cross-referencing tables misquote the "mobile device interface" limitation by reciting the function performed and omitting the structure that performs that function, Petitioner's analysis refers back to its claim 1 analysis of a limitation that performs the same "transmitting" function. *See* Pet. 52, 55. Moreover, Petitioner's claim 1 analysis demonstrates not only how the combination of Wong and Beauregard performs the "transmitting" function, but identifies the structure that performs the function. *Id.* at 39–41 (citing/quoting Ex. 1004 ¶¶ 41, 68, Fig. 3).

Specifically, Petitioner demonstrates that Wong's PC 210 transmits generated output data to mobile device 202 over a GPRS network. *Id.* at 40–41; Ex. 1004 ¶ 68, Fig. 3. Petitioner also demonstrates, based on the unrebutted testimony of Mr. McNair, that a person skilled in the art would

have known that "computer applications generally used built-in services of the computer operating system to provide a means to transmit output data to other . . . devices." *Id.* at 41 (citing Ex. 1003 ¶¶ 63–68). This testimony—which is not needed to demonstrate how the claim 1 "transmitting" limitation is met—demonstrates how the combination of Wong and Beauregard teaches the claim 5 and 7 limitation that not only requires the same "transmitting" function to be performed, but also requires the structure that performs that function, i.e., the mobile device interface. Thus, although Petitioner's cross-referencing tables erroneously state the last limitation of claims 5 and 7, Petitioner's cross-referenced analysis demonstrates how the "built-in services" of Wong's computer operating system map to a "mobile device interface at the computer [that] transmits the output data to a mobile device." *See* Pet. 41, 52, 55; § II.E.2, *infra* (construing "mobile device interface" to include "hardware, software, or a combination thereof that enables communication between a computer and a mobile device").

We disagree with Patent Owner's contentions that Petitioner never raised this argument in the Petition and that the more fulsome explanation provided in Petitioner's Reply was new argument. As noted above, despite a clerical error reciting the transmitting function of claims 5 and 7 but omitting the structure that performs that function, the Petition's analysis cross-references the Petition's analysis of the same transmitting function recited in claim 1. *See* Pet. 52, 55. Moreover, the Petition's analysis of claim 1's transmitting function demonstrates not only that Wong's computer performs the function, but identifies the built-in operating system services in Wong's computer that performs the function. *Id.* at 41 (citing Ex. 1003 ¶¶ 63–68). The additional explanation provided in Petitioner's Response, which demonstrates how the "built-in services" of Wong's computer

operating system satisfies our construction of a "mobile device interface" is allowable under our rules. *See* 37 C.F.R. § 42.23(b) (allowing a petitioner to "respond to arguments raised in the corresponding . . . patent owner response"); *see also* Consolidated Trial Practice Guide (Nov. 2019)[7] at 73 (allowing "the petitioner, in its reply brief, to address issues discussed in the institution decision").

To the extent Patent Owner disagrees that a person skilled in the art would have understood that an operating system has "built-in services" that transmit output data to other devices or that such "built-in services" meet our construction of a mobile device interface, Patent Owner had the opportunity to depose Mr. McNair and make that argument in its Sur-Reply. *See* Paper 11, 8 (authorizing Patent Owner to file a sur-reply); Paper 26, 1 (stipulation moving Petitioner's Reply date to June 28, 2021 and Patent Owner's Sur-Reply date to August 11, 2021); 37 C.F.R. § 42.53(d)(2) (authorizing cross-examination testimony to take place after "the direct testimony has been filed and more than a week before the filing date for any paper in which the cross-examination testimony is expected to be used"). Patent Owner chose not to avail itself of that opportunity.

Finally, we disagree with Patent Owner's contention that the Federal Circuit's decisions in *Elbit* or *Choirock* dictate a different outcome. Patent Owner cites *Elbit* for the proposition that Petitioner failed to meet its burden because it failed to mention the "mobile device interface" limitation in the Petition and Mr. McNair failed to mention the limitation in his declaration. *See* PO Resp. 25; PO Sur-Reply 16. Patent Owner cites *Choirock* for the proposition that Petitioner failed to meet its burden because it failed to

---

[7] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

clearly identify where the prior art taught the "mobile device interface" limitation. *See* PO Resp. 25; PO Sur-Reply 17.

Petitioner argues *Elbit* is inapposite because in *Elbit* "the prior art and the claims employed different steps," whereas the combination of Wong and Beauregard "teaches the same steps as the claims." Pet. Reply 4. Petitioner argues *Choirock* is inapposite because "the [*Choirock*] petition did not cross-reference" a limitation the petitioner subsequently tried to rely on, whereas the Petition cross-references the claim 1 "transmitting" limitation to demonstrate how the claim 5 and 7 mobile device interface limitation is met. *Id.* at 4–5.

We agree with Petitioner. In *Elbit*, the Federal Circuit affirmed a Board finding that the petitioner had not met its burden of proof because it was "undisputed" that a method step in the challenged claim was "not explicitly disclosed" in the prior art. *Elbit*, 881 F3d. at 1357. Moreover, although the *Elbit* petitioner's expert testified that the steps in the prior art were "mathematically equivalent" to the claimed method step, the Board found that testimony was "unsupported" and entitled to "little weight," and the Federal Circuit affirmed because "[t]he PTAB [i]s entitled to weigh the credibility of the witnesses" and "the weight and credibility of the evidence is the special province of the trier of fact." *Id.* at 1358 (internal citations omitted). Here, unlike in *Elbit*, we find Mr. McNair's testimony that an operating system's "built-in services" are a means to transmit output data to a mobile device to be credible, and agree with Petitioner that such "built-in services" map to our construction of a "mobile device interface." *See* Pet. 41 (identifying "built-in services" as the "means to transmit output data"); Pet. Reply 3 (demonstrating how "built-in services" map to our construction of a mobile device interface).

In *Choirock*, the Federal Circuit affirmed the Board's finding that the *Choirock* petitioner's claim limitation analysis, which cross-referenced an earlier claim limitation analysis, was deficient because the earlier claim limitation analysis did not mention the latter claim limitation "let alone explain[] how that requirement was met." *Choirock*, 801 Fed. Appx. at 765. Here, by contrast, the Petition's analysis of claims 5 and 7 reference the Petition's analysis of claim 1, and the Petition's analysis of claim 1 explains how an operating system's "built-in services" are a "means to transmit output data to other . . . devices," which is the only function a mobile device interface is required to perform per Patent Owner's own construction. Pet. 41, 52, 55; § II.E.2, *supra*. Although the Petition's claim 1 analysis does not call these "built-in services" a "mobile device interface," the test for whether the prior art teaches or suggests a claim limitation "is not an 'ipsissimis verbis' test." *In re Bond*, 910 F.2d 831, 832–833 (Fed. Cir. 1990); *see also In re Gleave*, 500 F.3d 1331, 1334 (Fed. Cir. 2009) (a prior art reference "need not satisfy an *ipsissimis verbis* test"). Moreover, Petitioner's Reply, in addition to identifying the "built-in-services" of Wong's computer operating system as the structure that transmits output data to a mobile device, demonstrates how those built-in services map to our construction of a "mobile device interface," which includes Patent Owner's own proposed construction. *See* Pet. Reply 3; *see also* § II.E.2, *supra* (construing "mobile device interface" to include Patent Owner's proposed construction).

Accordingly, for the reasons discussed above, we find Petitioner has demonstrated by a preponderance of evidence that the limitations of claims 5 and 7 have been met for substantially the same reasons that the limitations of claims 1 and 3 have been met. Therefore, Petitioner has demonstrated by a

preponderance of evidence that claims 5 and 7 are unpatentable over Wong and Beauregard for the same reasons as claims 1 and 3.

*8. Claims 2, 4, 6, and 8*

Claim 2 depends from claim 1 and requires (a) the mobile device and computer not to be physically connected and (b) the application selected by the audio command interface to be installed on the computer. Ex. 1001, 10:26–29. Claim 4 depends from claim 3 and recites the same limitations. *Id.* at 10:46–49. Claims 6 and 8 depend from claims 5 and 7, respectively, and recite the same limitations. *Id.* at 11:6–9, 12:12–15

Petitioner demonstrates how the combination of Wong and Beauregard teaches these limitations. *See* Pet. 41–47, 50, and 53–55 (citing/quoting Ex. 1004 ¶¶ 13, 31, 33, 40, 41, 66, Figs. 2, 3, 4a; Ex. 1005, 5:19–22, 36:49–51, 55:42–58, Figs. 3, 4). Patent Owner does not dispute this. *See* PO Resp. 28–49.

Wong discloses a system in which smart phone 202 is physically separated from PC 210 by mobile network 206, yet controls application 220 installed on PC 210 to browse stored files 224 via commands interpreted by speech engine 213. *See* Ex. 1004 ¶¶ 13 (disclosing using mobile device such as smart phone 202 to browse files from a remote location), *id.* ¶ 31 (disclosing PC 210 is configured to communicate with smart phone 202), *id.* ¶ 33 (disclosing PC 210 stores application 220 and files 224), *id.* ¶ 41 (disclosing PC 210 executes a received command to transmit data to mobile device/smart phone 202), *id.* ¶ 61 (disclosing PC 210 and smart phone 202 need not be in proximity), Figs. 2, 3, 4a.

Accordingly, for the reasons discussed above, we find Petitioner has demonstrated by a preponderance of evidence that claims 2, 4, 6, and 8 are unpatentable over Wong and Beauregard.

*G. Obviousness over Ben-Efraim and Balakrishnan*

As discussed in §§ II.F.3–II.F.8, *supra*, Petitioner has shown by a preponderance of evidence that claims 1–8 of the '679 patent are unpatentable as obvious over Wong and Beauregard. This finding is dispositive of Petitioner's challenge to the patentability of all of the challenged claims. Accordingly, we need not address whether Petitioner has further shown, by a preponderance of evidence, that these claims also are unpatentable as obvious over the combination of Ben-Efraim and Balakrishnan. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) (finding an administrative agency is at liberty to reach a decision based on a single dispositive issue because doing so "can not only save the parties, the [agency], and [the reviewing] court unnecessary cost and effort," but can "greatly ease the burden on [an agency] faced with a . . . proceeding involving numerous complex issues and required by statute to reach its conclusion within rigid time limits").

III. CONCLUSION

We have reviewed the Petition, Patent Owner Response, Petitioner Reply, and Patent Owner Sur-Reply. We have considered all of the evidence and arguments presented by Petitioner and Patent Owner. We find, on this record, Petitioner has demonstrated by a preponderance of evidence that claims 1–8 of the '679 patent are unpatentable as obvious over Wong and Beauregard.[8]

---

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application

| **Claims** | **35 U.S.C. §** | **Reference(s) /Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–8 | 103(a) | Wong, Beauregard | 1–8 | |
| 1–8 | 103(a) | Ben-Efraim, Balakrishnan | Not Decided | Not Decided |
| **Overall Outcome** | | | 1–8 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown on this record that claims 1–8 of the ’679 patent are unpatentable under 35 U.S.C. § 103(a) over Wong and Beauregard; and

FURTHER ORDERED that this Decision is final, and a party to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

FOR PETITIONER:

Jordan M. Rossen
Roshan Mansinghani
Michelle Callaghan
UNIFIED PATENTS LLC
jordan@unifiedpatents.com
roshan@unifiedpatents.com
micelle@unifiedpatents.com

FOR PATENT OWNER:

Eric M. Adams
Tod T. Tumey
TUMEY LLP
eadams@tumeyllp.com
ttumey@tumeyllp.com

Trials@uspto.gov
571-272-7822

Paper 52
Entered: June 28, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

UNIFIED PATENTS, INC.,
Petitioner,

v.

VOICE TECH CORPORATION,
Patent Owner.

---

Case IPR2020-01018
Patent 10,491,679 B2

---

Before GEORIANNA W. BRADEN, JOHN F. HORVATH, and MICHAEL T. CYGAN *Administrative Patent Judges*.

HORVATH, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request on Rehearing
of Final Written Decision
*37 C.F.R. § 42.71(d)*

# I. INTRODUCTION

On December 13, 2021, we entered a Final Written Decision determining that Unified Patents, Inc. ("Petitioner" or "Unified") had shown, by a preponderance of evidence, that claims 1–8 of U.S. Patent No. 10,491,679 B2 (Ex. 1001, "the '679 patent") are unpatentable. Paper 46 ("Final Dec." or "Decision").

On January 12, 2022, Voice Tech Corporation ("Patent Owner") filed a Request for Rehearing, asking us to reconsider our Decision. Paper 47 ("Reh'g Req."). The same day, Patent Owner also asked the Precedential Opinion Panel to review our Decision. Ex. 3006. On March 3, 2022, the Precedential Opinion Panel denied Patent Owner's request and ordered this panel to consider Patent Owner's Request for Rehearing. Paper 51, 2. For the reasons discussed below, the Request for Rehearing is *denied*.

# II. ANALYSIS

A party requesting rehearing "must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply." 37 C.F.R. § 42.71(d). The burden of showing a decision should be modified on a request for rehearing lies with the party challenging the decision. *Id*. A rehearing request is not an opportunity for the requesting party to reargue its case or express disagreement with the Final Written Decision. Nor is it an opportunity for the moving party to present new arguments that were not in its original submissions.

## *A. Real Party-in-Interest*

Patent Owner asks us to reconsider our decision declining to determine whether Mycroft AI Inc. ("Mycroft") is an unnamed real party-in-

interest ("RPI") and declining to terminate the proceeding for Petitioner's failure to identify Mycroft as an RPI. Reh'g Req. 2–7. Patent Owner argues we misapprehended its "arguments, related statutes and regulations, [and] related case law." *Id.* at 3. Patent Owner further argues that because, in its view, Mycroft is an unnamed RPI in this proceeding, Mycroft "will not be estopped from raising the same invalidity arguments" raised by Unified in the ongoing patent infringement case between Mycroft and Patent Owner. *Id.* at 4. Patent Owner also argues that, "from a policy standpoint, the Board must enforce the RPI disclosure requirement by dismissing this IPR proceeding." *Id.*

We disagree that we misapprehended Patent Owner's arguments, which are based on a mistaken belief that for a party to be estopped under 35 U.S.C. § 315(e) that party must have been identified as an RPI in an *inter partes* review. *See* Reh'g Req. 6. The § 315(e) estoppel provisions are prospective—they apply to the petitioner, its RPIs, and its privies who commence or maintain an action *after* a final written decision has issued. 35 U.S.C. § 315(e); *see also Intuitive Surgical, Inc. v. Ethicon LLC*, 25 F.4th 1035, 1041 (Fed. Cir. 2022) ("The plain language of § 315(e)(1) is clear that estoppel is triggered when an IPR proceeding results in a final written decision."). For that reason, § 315(e) does not require the RPIs and privies of the petitioner to be determined *before* the final written decision issues. As we previously explained, our Decision was the first "final written decision as to any claim of the '679 patent. Thus, even if we were to determine that Mycroft is an unnamed RPI, § 315(e)(1) would prevent Mycroft from requesting a *future* proceeding challenging a claim at issue in this proceeding" but does not require terminating this proceeding. Final

Dec. 6–7; *see also VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, 778 Fed. Appx. 897, 903 (Fed. Cir. 2019) ("[e]ven if we agree that [a third party] was a real party in interest, there would be no reason to terminate these proceedings").

We also disagree with Patent Owner's argument that as a matter of policy, the Office must enforce the RPI disclosure requirement by terminating *any* proceeding in which a party failed to identify an RPI. *See* Reh'g Req. 4 ("from a policy standpoint, the Board must enforce the RPI disclosure requirement by dismissing this IPR proceeding" because "[o]therwise, there is no punishment for violating the RPI disclosure requirement"). The Office's policies are expressed, *inter alia*, through its properly promulgated rules, procedures, and precedential opinions. Patent Owner cites none of these to support its contention that "policy" requires the Board to terminate a proceeding simply because a petitioner allegedly failed to comply with its RPI disclosure requirements. Reh'g Req. 2–7. To the contrary, the Federal Circuit has found that "unwinding the proceedings based on a strict view of the real party-in-interest disclosure requirement would be at odds with the PTO policy expressed in [37 C.F.R.] § 42.1(b)." *Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1240 (Fed. Cir. 2019)); *see also VirnetX*, 778 Fed. Appx. at 903 ("[e]ven if we agree that [a third party] was a real party in interest, there would be no reason to terminate these proceedings" because "[t]here is no evidence in the record that [the third party] is time-barred"). We decline to decide this case based on Patent Owner's supposed "policy" considerations, which are unsupported by binding case law or any declared Patent Office policy.

For the reasons discussed above, we are not persuaded that we misapprehended Patent Owner's arguments or the statutes, regulations, and related case law regarding the real party-in-interest disclosure requirement when we (a) declined to determine whether Mycroft was an unnamed RPI of Petitioner or (b) declined to terminate this proceeding.

*B. The "executing/generating" limitation*

Patent Owner asks us to reconsider our finding that "the limitations of claims 5 and 7 were met for substantially the same reasons that the limitations of claims 1 and 3 were met." Reh'g Req. 9. Patent Owner argues "claims 5 and 7 recite the audio command interface performing the 'executing' and 'generating' steps" and "Petitioner did not argue that the alleged audio command interfaces of Wong or Beauregard performed" these steps. *Id.* at 8 (emphasis omitted). Instead, Patent Owner contends, Petitioner argued that Wong's "PC 210 performs the 'executing' step in claim 1" or that "an *application* in Wong" performs this step, but did not argue "that Beauregard's alleged audio command interface (MIKE 330) is the component performing the 'executing' step." *Id.* at 8–9 (citing Pet. 32, 35–37). Patent Owner also contends that Petitioner argued that "PC 210 performs the 'generating' step in claim 1" and "*did not suggest* that Wong's alleged audio command interface (speech engine 213) performs the 'generating' step," and did not mention "Beauregard's allege[d] audio command interface (MIKE 330)." *Id.* at 9 (citing Pet. 37–38).

We disagree. Petitioner argued that the claim 5 limitations "are obvious for the same reasons as the corresponding limitations in claims 1 and 2," and that the "corresponding limitations of [c]laims 1, 3, and 5 . . . show how each limitation of claim 7 is disclosed." Final Dec. 39 (quoting

Pet. 50, 54). Two tables in the Petition map the "audio command interface," "executing," and "generating" limitations of claims 5 and 7, respectively, to corresponding limitations of claim 1 designated as limitations [1.1] (audio command interface), [1.4] (the "executing" limitation), and [1.5] (the "generating" limitation). *See* Pet. 51–52, 54–55 (citing *id.* at 20–27 (limitation [1.1]), 32–37 (limitation [1.4]), and 37–39 (limitation [1.5])).

In our Decision, we found "Petitioner's claim 1 analysis demonstrates how the Wong/Beauregard audio command interface—i.e., Wong's speech engine 213 modified to include logic from Beauregard's MIKE 330—" teaches both the "executing" and "generating" limitations. Final Dec. 40–41 (citing Pet. 32–37). Patent Owner fails to demonstrate how this misapprehended or misunderstood Petitioner's arguments. Indeed, on the very pages Patent Owner cites in support of its contention that Petitioner relied only on the teachings of Wong to meet the "executing" and "generating" limitations, the Petition expressly states "*Wong* alone, or in view of *Beauregard*, discloses or at least renders obvious" these limitations. Pet. 32, 37.

Petitioner's analysis explains how components of Beauregard's MIKE 330 teach the "executing" and "generating" limitations, and why a person skilled in the art would have modified Wong's speech engine 213 to include them. Pet. 14–18, 35–39. Our Decision relies on and agrees with that analysis. Final Dec. 35–36, 40–41. As we found, when Wong's speech engine 213 is modified to include components of Beauregard's MIKE 330, "fetcher 220 searches wordbase 340 for a matching command, and command interpreter 430 executes a script associated with that command, which causes an application or the operating system to execute a process." *Id.*

at 35–36 (citing Ex. 1005, 5:44–46, 16:41–45, 17:21–22, 17:33–36, 28:65–29:14), *id.* at 40. This satisfies the "executing" limitation, which requires Wong's modified audio command interface to "execute *with* the selected . . . application the at least one process . . . in response to the command." Ex. 1001, 10:65–67, 12:6–8 (emphasis added). Moreover, when "command interpreter 430 executes a script it 'sends all keyboard related actions (replacements, special keys, and the like) associated with [the] fetched action words . . . to the applications 118." Final Dec. 40–41 (quoting Ex. 1005, 10:22–40, 29:13–17). This satisfies the "generating" output data limitation because the keyboard related actions that are sent by Wong's modified audio command interface can be, for example, replacement text to correct a misspelling. *See* Ex. 1005, 29:17–21 ("when the action word entered by the user requires a substitution (e.g., 'Junc' to 'June') the command interpreter 430 forwards the replacement text to the application program").

For the reasons discussed above, Patent Owner fails to demonstrate that we misapprehended or misunderstood Petitioner's arguments in determining that the *combination* of Wong and Beauregard meets the "executing" and "generating" limitations of claims 5 and 7.

*C. The "mobile device interface" limitation*

Patent Owner asks us to reconsider our finding that claims 5–8 are unpatentable based on our "finding that the single reference to 'built-in services' was sufficient to make the entire argument for the 'MDI' [mobile device interface] limitations in claims 5 and 7." Reh'g Req. 13. Patent Owner argues we misapprehended "the significance of Petitioner's . . .

complete failure to even mention the ‘MDI’ limitation” because “Petitioner was required to address the ‘MDI’ limitation in its Petition.” *Id.* at 10.

We disagree. The last limitation of claim 1 recites “transmitting the output data to the mobile [de]vice.” Ex. 1001, 10:25 (“the transmitting limitation”). The last limitation of claims 5 and 7 recite “wherein a mobile device interface at the computer transmits the output data to the mobile device.” *Id.* at 11:4–5, 12:11–12 (the “mobile device interface limitation”). Petitioner argued the combination of Wong and Beauregard met the limitations of claims 5 and 7 for the same reasons it met the corresponding limitations of claims 1–3 and provided two tables mapping the limitations of claims 5 and 7, respectively, to the limitations of claims 1–3. Pet. 50–52 (claim 5), 54–55 (claim 7). Petitioner mapped the last limitation of claims 5 and 7 to the last limitation of claim 1, but mistakenly wrote the limitation as “transmitting the output data to the mobile device” rather than “wherein a mobile device interface at the computer transmits the output data to the mobile device.” *Id.* at 52, 55. In our Decision, we found this was a clerical error that simply misquoted the mobile device interface limitation “by reciting the function performed and omitting the structure that performs that function.” Final Dec. 42. We, nonetheless, found Petitioner had demonstrated how the mobile device interface limitation was met because Petitioner’s cross-referenced analysis “demonstrates not only how the combination of Wong and Beauregard performs the ‘transmitting’ function, but identifies the structure that performs the function.” *Id.* We had previously made similar findings in our Institution Decision. *See* Paper 10, 25–27.

Patent Owner argues we improperly considered arguments first raised in Petitioner's Reply. *See* Reh'g Req. 10 ("Petitioner was required to address the limitation in its Petition" and the "Board relied on new arguments in Petitioner's Reply"). We disagree. Although we found Petitioner's Reply arguments were allowable, we did not rely on them in finding Petitioner had demonstrated how Wong taught the mobile device interface limitation. *See* Final Dec. 42–43. Specifically, we found Wong disclosed "PC 210 transmits generated output data to mobile device 202 over a GPRS network" and persons skilled in the art "would have known that 'computer applications generally used built-in services of the computer operating system to provide *means to transmit output data* to other . . . devices." *Id.* at 42 (citing Pet. 40–41; Ex. 1004 ¶ 68, Fig. 3; Ex. 1003 ¶¶ 63–68) (emphasis added). We further found "Petitioner's claim 1 analysis demonstrates not only how the combination of Wong and Beauregard performs the 'transmitting' function, but identifies the structure that performs the function." *Id.* (citing Pet. 39–41). All of these citations are to the Petition; none are to Petitioner's Reply.

Next, Patent Owner argues we erred in finding Petitioner misquoted the mobile device interface limitation and demonstrated how that limitation was met because Petitioner never mentioned the term "mobile device interface" or addressed that limitation in its claim 1 analysis. *See* Reh'g Req. 10. We disagree. Petitioner's cross-referencing tables for claims 5 and 7 reference Petitioner's analysis of the "transmitting" limitation of claim 1 to demonstrate how the last limitation of claims 5 and 7 was met. Pet. 52, 55. Petitioner's claim 1 analysis demonstrates not only that Wong's PC 210 "transmit[s] the output data," but that a person skilled in the art would have

known that PC 210 included built-in operating system services that transmit output data. *Id.* at 39–41 (citing Ex. 1004 ¶¶ 41, 68, Fig. 3; Ex. 1003 ¶¶ 63–68). The Petition did not need to identify these built-in services to demonstrate how the transmitting limitation of claim 1 was met, but did need to identify them to demonstrate how the mobile device interface limitation of claims 5 and 7 was met. This supports our finding that Petitioner simply misquoted the last limitation of claims 5 and 7.

Patent Owner next argues that we misapprehended the holding in *Elbit Systems of America, LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358–59 (Fed. Cir. 2018) because "the point of *Elbit* is that there was no expert testimony on [a] limitation" and "[t]he Federal Circuit gave no credence to Elbit's expert . . . because he had failed to even mention the limitation in his opinion." Reh'g Req. 11–12. We disagree. *Elbit Systems* concerned the Board's ability to weigh competing expert testimony. 881 F.3d at 1357. In *Elbit Systems*, the Board found the prior art failed to teach a claim limitation by crediting the testimony of patent owner's expert over petitioner's expert. *Id.* at 1358. The Federal Circuit found substantial evidence supported this finding and also found the Board was "entitled to weigh the credibility of the witnesses" because "[d]etermining the weight and credibility of the evidence is the special province of the trier of fact." *Id.* Here, we have no competing expert testimony to weigh. Petitioner's expert provided credible testimony that a person skilled in the art would have understood Wong's PC 210 used built-in operating system services to transmit data to a mobile device. Ex. 1003 ¶ 63. Patent Owner has not introduced any competing or contradictory evidence that challenges that testimony. We explained this in our Decision and Patent Owner fails to demonstrate that this was error. *See*

Final Dec. 44–45.

Finally, Patent Owner argues that we misapprehended the holding in *Choirock Contents Factory Co., Ltd. v. Saucier*, 801 Fed. Appx. 754 (Fed. Cir. 2020) because that decision requires "clear identification of where the prior art teaches a limitation." Reh'g Req. 12. We disagree. As explained by the Federal Circuit in *Choirock*, the Board had "rejected Choirock's incorporation of its claim 2 argument because the petition did not cross-reference the claim 2 argument." *Choirock*, 801 Fed. Appx. at 764. Moreover, on the merits, the Board had found Choirock's analysis of claim 2 was "directed to whether [certain] components 'have' images, but failed to address the limitations of claims 7 and 8 requiring that the [components] move to expose previously unexposed images." *Id.* Here, it is undisputed that Petitioner's analyses of the last limitation of claims 5 and 7 reference its analysis of the transmitting limitation of claim 1. Pet. 39–47, 52, 55. Moreover, Petitioner's claim 1 analysis demonstrates not only that Wong's PC 210 transmits data to a mobile device, but that its "built-in services" are the "means" for transmitting that data, i.e., they are the "mobile device interface" required by claims 5 and 7. *Id.* at 39–41 (citing Ex. 1003 ¶¶ 63–68). We explained this in our Decision, and Patent Owner fails to demonstrate how that was error. Final Dec. 46.

*D. The "decoding" limitation*

Patent Owner asks us to reconsider our findings on "the meaning of 'decoding' and whether the combination of Wong/Beauregard renders claims 1–8 obvious." Reh'g Req. 15. Patent Owner argues we erred by "rel[ying] on statements in Wong referring to speech engine 213 parsing audio data" and misapprehending that Wong defined "parsing" as "speech to

text translation." *Id.* (emphasis omitted). Patent Owner further argues we erred in finding Wong's disclosure of "identify[ing] voice commands" met the "decoding" limitation because there is "no support for finding that 'decoding' should be defined to mean 'identifying.'" *Id.* at 13–14. We disagree.

First, Wong does not limit the meaning of "parsing" to performing "speech-to-text" translation.[1] As we noted in our Decision, "Wong expressly discloses 'speech engine 213 [] is configured to *identify* voice commands and keywords.'" Final Dec. 30 (quoting Ex. 1004 ¶ 32). That Wong's speech engine 213 "identifies" a command when it "parses" it is evident from Figure 4a. After "speech engine 213 parses [a] command" in step 404, it searches a keyword database in step 406 to determine whether "a word appears *in the command* that is not a command word or is in addition to the command word." Ex. 1004 ¶ 39, Fig. 4a. To be able to make that determination, speech engine 213 must have "identified" the command as Wong expressly states. Ex. 1004 ¶ 32.

Second, as we also noted in our Decision, Patent Owner's arguments are based on an embodiment of Wong that Petitioner does not rely on, i.e., an embodiment where mobile device 202 uses speech recognition module 240 to "parse" a command. Final Dec. 30–31; Ex. 1004 ¶¶ 44–45,

---

[1] Even if it did, that would be sufficient to meet the "decoding" limitation. The '679 patent discloses "a voice command can be decoded by determining the equivalent word for a spoken word." Ex. 1001, 8:25–27. Thus, if Wong's speech engine 213 were limited to performing speech-to-text translation, as Patent Owner contends, Wong discloses decoding audio data into a command because the input to a "speech-to-text" translation engine is a "spoken word" and the output is an "equivalent [textual] word."

Fig. 2. However, even in that embodiment, when speech recognition module 240 "parses" a command it "identifies" the command and its keywords. For example, Wong discloses speech recognition module 240 "*identifies* a keyword when spoken by a user." Ex. 1004 ¶¶ 44–45. To be able to *identify* a keyword associated with a command, speech recognition module 240 must be able to *identify* the command itself. Wong's smart phone 202 then sends a text message to PC 210 containing "a keyword . . . *with a command*," which further evidences that Wong's speech recognition module 240, like speech engine 213, "identifies" a command when it "parses" it. *Id.* ¶ 46.

Finally, as we also noted in our Decision, the Petition did not rely on Wong alone to teach the decoding limitation. *See* Final Dec. 29–31 (citing Pet. 27–29). Petitioner "proposes modifying [Wong's] speech engine 213 to include logic from Beauregard's MIKE 330 to . . . identify commands" and Beauregard identifies commands by "converting voice data to text, and providing the text to . . . command interpreter 430," which "passes the text to fetcher 420, which searches wordbase 340 for matching action words." *Id.* at 30–31. Thus, the *combination* of Wong and Beauregard teaches the decoding limitation, and Patent Owner neither disputes that finding nor demonstrates it was in error. *See* Reh'g Req. 13–15.

For the reasons discussed above, we disagree with Patent Owner's contention that we erred in finding claims 1–8 unpatentable because we erred in finding the prior art taught or suggested an audio command interface that decodes audio data into a command.

## III. CONCLUSION

For the reasons discussed above, Patent Owner has failed to demonstrate that we misapprehended or overlooked any matters in the Final Written Decision. Accordingly, we deny Patent Owner's Request for Rehearing.

Outcome of Decision on Rehearing:

| **Claims** | **35 U.S.C §** | **Reference(s)/Basis** | **Denied** | **Granted** |
|---|---|---|---|---|
| 1–8 | 103(a) | Wong, Beauregard | 1–8 | |
| **Overall Outcome** | | | 1–8 | |

Final Outcome of Final Written Decision after Rehearing

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–8 | 103(a) | Wong, Beauregard | 1–8 | |
| 1–8 | 103(a) | Ben-Efraim, Balakrishnan[2] | | |
| **Overall Outcome** | | | 1–8 | |

## IV. ORDER

It is ORDERED that Patent Owner's Request for Rehearing is *denied.*

[2] Because we find these claims unpatentable on other grounds, we do not consider their patentability over Ben-Efraim and Balakrishnan.

For PETITIONER:

Jordan M. Rossen
Roshan Mansinghani
Michelle Callaghan
UNIFIED PATENTS LLC
jordan@unifiedpatents.com
roshan@unifiedpatents.com
micelle@unifiedpatents.com

For PATENT OWNER:

Eric M. Adams
Tod T. Tumey
TUMEY LLP
eadams@tumeyllp.com
ttumey@tumeyllp.com

US010491679B2

(12) **United States Patent**
**Smith**

(10) **Patent No.: US 10,491,679 B2**
(45) **Date of Patent: *Nov. 26, 2019**

(54) **USING VOICE COMMANDS FROM A MOBILE DEVICE TO REMOTELY ACCESS AND CONTROL A COMPUTER**

(71) Applicant: **Voice Tech Corporation**, Tyler, TX (US)

(72) Inventor: **Todd R. Smith**, Houston, TX (US)

(73) Assignee: **Voice Tech Corporation**, Tyler, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 80 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/704,871**

(22) Filed: **Sep. 14, 2017**

(65) **Prior Publication Data**

US 2018/0020059 A1 Jan. 18, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 11/809,998, filed on Jun. 4, 2007, now Pat. No. 9,794,348.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/08*** | (2006.01) |
| ***G06F 9/48*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |
| ***H04M 3/493*** | (2006.01) |
| ***H04M 11/00*** | (2006.01) |
| ***G10L 15/26*** | (2006.01) |

(52) **U.S. Cl.**

CPC .......... ***H04L 67/125*** (2013.01); ***G06F 9/4843*** (2013.01); ***H04L 63/083*** (2013.01); ***H04M 3/4938*** (2013.01); ***H04M 11/007*** (2013.01); *G10L 15/26* (2013.01); *H04M 2203/1033* (2013.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,144,938 | A | 11/2000 | Surace et al. | |
| 6,339,706 | B1 | 1/2002 | Tillgren et al. | |
| 6,362,897 | B1 | 3/2002 | Berg et al. | |
| 6,535,243 | B1 | 3/2003 | Tullis | |
| 6,714,222 | B1 * | 3/2004 | Bjorn | G06F 3/0481 715/773 |
| 6,895,558 | B1 | 5/2005 | Loveland | |
| 6,901,270 | B1 | 5/2005 | Beach | |
| 6,970,915 | B1 | 11/2005 | Partovi et al. | |
| 7,027,987 | B1 | 4/2006 | Franz et al. | |
| 7,043,749 | B1 | 5/2006 | Davies | |
| 7,047,200 | B2 | 5/2006 | Schmid et al. | |
| 7,054,818 | B2 | 5/2006 | Sharma et al. | |

(Continued)

*Primary Examiner* — Thuykhanh Le

(74) *Attorney, Agent, or Firm* — Tumey L.L.P.

(57) **ABSTRACT**

A method of using voice commands from a mobile device to remotely access and control a computer. The method includes receiving audio data from the mobile device at the computer. The audio data is decoded into a command. A software program that the command was provided for is determined. At least one process is executed at the computer in response to the command. Output data is generated at the computer in response to executing at least one process at the computer. The output data is transmitted to the mobile device.

**8 Claims, 2 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

7,539,619 B1 5/2009 Seligman et al.
7,640,160 B2 * 12/2009 Di Cristo .............. G06F 17/279 704/257
7,676,368 B2 * 3/2010 Shizuka .................. G10L 13/00 704/260
7,684,985 B2 * 3/2010 Dominach .............. G10L 15/22 704/235
7,729,916 B2 * 6/2010 Coffman ................. G10L 15/22 704/270
7,751,535 B2 * 7/2010 Creamer ............. H04M 3/4938 379/69
7,751,807 B2 7/2010 Lin et al.
7,822,610 B2 * 10/2010 Burns ..................... G10L 15/22 704/231
7,835,901 B2 * 11/2010 Muramatsu ............ G01C 21/36 704/231
7,895,594 B2 2/2011 Kirilline et al.
8,942,985 B2 * 1/2015 Mowatt ................... G06F 3/167 704/275
9,037,451 B2 * 5/2015 Johnson .............. G06F 17/2881 370/356
2002/0052746 A1 * 5/2002 Handelman ............ H04N 7/163 704/270
2002/0065654 A1 5/2002 Grant et al.
2002/0180798 A1 12/2002 Poor et al.
2003/0046082 A1 * 3/2003 Siegel .................... G09B 5/065 704/270
2003/0069944 A1 4/2003 Barlock et al.
2003/0163321 A1 * 8/2003 Mault .................... A61B 5/044 704/270
2003/0187655 A1 * 10/2003 Dunsmuir ......... H04M 3/53333 704/270
2003/0215115 A1 11/2003 Kim et al.
2004/0027392 A1 2/2004 Dunn et al.
2004/0054539 A1 3/2004 Simpson
2004/0086120 A1 * 5/2004 Akins, III ............ G11B 27/034 380/240
2004/0176958 A1 9/2004 Salmenkaita et al.
2005/0114141 A1 * 5/2005 Grody ..................... G10L 15/30 704/270
2005/0223101 A1 10/2005 Hayes, Jr.
2006/0012677 A1 1/2006 Neven, Sr. et al.
2006/0026281 A1 2/2006 Hodgson et al.
2006/0050933 A1 3/2006 Adam et al.
2006/0100879 A1 * 5/2006 Jakobsen .............. H04M 1/271 704/270
2006/0111909 A1 * 5/2006 Maes ................ H04L 29/06027 704/270
2006/0235700 A1 * 10/2006 Wong ...................... G10L 15/26 704/275
2006/0277590 A1 * 12/2006 Limont ............... H04L 67/1095 726/1
2007/0060176 A1 * 3/2007 Sloo ........................ G06F 9/546 455/466
2007/0061488 A1 3/2007 Alagappan et al.
2007/0123191 A1 5/2007 Simpson
2007/0184899 A1 * 8/2007 Rantapuska ............ G06F 9/541 463/30
2007/0233842 A1 * 10/2007 Roberts ................. G06F 21/552 709/223
2007/0244892 A1 10/2007 Narancic
2007/0249365 A1 10/2007 Jendbro
2008/0021598 A1 * 1/2008 Daude .................... B60K 35/00 701/1
2008/0065388 A1 * 3/2008 Cross ...................... G10L 13/00 704/270
2008/0082332 A1 * 4/2008 Mallett ................... G10L 15/07 704/250
2008/0140415 A1 6/2008 Shostak
2008/0163088 A1 * 7/2008 Pradhan .................. G06F 9/451 715/764
2008/0163330 A1 * 7/2008 Sparrell ............... H04M 11/007 725/142
2008/0194276 A1 8/2008 Lin et al.
2008/0243501 A1 * 10/2008 Hafsteinsson ........ G10L 15/265 704/235
2008/0300884 A1 12/2008 Smith
2008/0300886 A1 12/2008 Patch
2009/0182700 A1 7/2009 Hodges

* cited by examiner




FIGURE 1 100




FIGURE 2 200




FIGURE 3 300


RECEIVE CALL FROM MOBILE DEVICE
402
ESTABLISH SESSION WITH MOBILE DEVICE
404
NO
YES
VOICE, DATA COMMAND?
406
PROMPT USER TO ENTER VOICE OR DATA COMMAND
408
DECODE COMMAND
410
YES
NO
OPERATING SYSTEM COMMAND?
412
EXECUTE COMMAND
414
YES
NO
NATIVE APP. COMMAND?
416
EXECUTE COMMAND
418
GENERATE ERROR MESSAGE
420
CONVERT AUDIO, VIDEO OUTPUT TO MOBILE DEVICE FORMAT
422
TRANSMIT TO MOBILE DEVICE
424
NO
YES
RESPONSE?
426
TERMINATE
428
400

FIGURE 4

# USING VOICE COMMANDS FROM A MOBILE DEVICE TO REMOTELY ACCESS AND CONTROL A COMPUTER

## FIELD OF THE INVENTION

The present invention pertains to the field of computer operating systems, and more specifically to a system for using voice commands from a mobile device to remotely access and control a computer, and a method of use that allows a person to use voice commands from a mobile device to remotely access and control a computer.

## BACKGROUND OF THE RELATED ART

Systems for allowing a person to use voice commands from a mobile device to remotely access and control a computer are known in the art. However, such prior art systems are application-specific, meaning they are configured to allow the person to use voice commands from a mobile device to remotely access and control a specific application at a computer. Therefore, the prior art systems require the person to have multiple mobile devices and/or systems to remotely access and control the different applications at a computer. Additionally, the prior art systems limit the audible and visible feedback the person can receive from a computer while using voice commands from a mobile device to remotely access and control the computer.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a system is provided for using voice commands from a mobile device to remotely access and control a computer, and a method of use is provided that allows a person to use voice commands from a mobile device to remotely access and control a computer.

In particular, a system and method of use are provided that allow a person to use voice commands from a mobile device to remotely interact with a computer.

In accordance with an exemplary embodiment of the present invention, a method of using voice commands from a mobile device to remotely access and control a computer is provided. The method includes receiving audio data from the mobile device at the computer. The audio data is decoded into a command. A software program that the command was provided for is determined. At least one process is executed at the computer in response to the command. Output data is generated at the computer in response to executing at least one process at the computer. The output data is transmitted to the mobile device.

The present invention provides many important technical advantages. One important technical advantage of the present invention is a system that allows a person to use voice commands from a mobile device to remotely access and control a computer and see and hear the images and sounds generated at the computer, in response to the voice commands, in a manner similar to what the person would see and hear, if the person were directly and locally accessing and controlling the computer using a voice command system.

Those skilled in the art will further appreciate the advantages and superior features of the invention together with other important aspects thereof on reading the detailed description that follows in conjunction with the drawings.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. **1** is a diagram of a system for using voice commands from a mobile device to remotely access and control a computer in accordance with an exemplary embodiment of the present invention;



FIG. **2** is a diagram of a system for providing a mobile device interface in accordance with an exemplary embodiment of the present invention;

FIG. **3** is a diagram of a system for providing an audio command interface in accordance with an exemplary embodiment of the present invention; and

FIG. **4** is a diagram of a method for using voice commands from a mobile device to remotely access and control a general purpose computer in accordance with an exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

In the description that follows, like parts are marked throughout the specification and drawings with the same reference numerals, respectively. The drawing figures might not be to scale, and certain components can be shown in generalized or schematic form and identified by commercial designations in the interest of clarity and conciseness.

FIG. **1** is a diagram of system **100** for using voice commands from a mobile device to remotely access and control a computer in accordance with an exemplary embodiment of the present invention. System **100** allows a person to use voice commands from a mobile device to remotely access and control a computer, whereby the person can operate the operating system at the computer, operate native applications at the computer, and see and hear the images and sounds generated at the computer in response to the voice commands.

System **100** includes mobile device **102**, which can be a suitable mobile device such as a cellular phone, smart phone, touch-screen device, personal digital assistant, tablet device, notebook device, laptop device, or other suitable mobile device that allows communication with a computer via a wireless or wire-line network or a suitable combination of a wireless and wire-line network.

System **100** also includes general purpose computer **104**, which can be a general purpose processing platform or other suitable processing platforms. General purpose computer **104** includes mobile device interface **106**, audio command interface **108**, operating system interface **110**, and native applications **112**, each of which can be implemented in hardware, software, or a suitable combination of hardware and software, which can be one or more software systems operating on a general purpose processing platform. As used herein, "hardware" can include a combination of discrete components, an integrated circuit, an application-specific integrated circuit, a field programmable gate array, or other suitable hardware. As used herein, "software" can include one or more objects, agents, threads, lines of code, subroutines, separate software applications, two or more lines of code or other suitable software structures operating in two or more software applications or on two or more processors, or other suitable software structures. In one exemplary embodiment, software can include one or more lines of code or other suitable software structures operating in a general purpose software application, such as an operating system; and one or more lines of code or other suitable software structures operating in a specific purpose software application.

Mobile device **102** is coupled to general purpose computer **104** via communications medium **114**. As used herein, "communications medium" can include a wire-line communications medium, a wireless communications medium, an optical communications medium, an analog communications medium, a digital communications medium, other

suitable communications media or a suitable combination of communications media. As used herein, the term "coupled" and its cognate terms such as "couples" or "couple," can include a physical connection (such as a wire, optical fiber, or a telecommunications medium), a virtual connection (such as through randomly assigned memory locations of a data memory device or a hypertext transfer protocol (HTTP) link), a logical connection (such as through one or more semiconductor devices in an integrated circuit), or other suitable connections. In one exemplary embodiment, a communications medium can be a network or other suitable communications media.

Mobile device interface **106** receives voice or data information from mobile device **102**. In one exemplary embodiment, mobile device interface **106** is configured to monitor communications medium **114** interface devices, or other suitable mechanisms for interfacing with communications medium **114**. In this exemplary embodiment, mobile device interface **106** can monitor a public switched telephone network (PSTN) modem that responds to ring signals when a call is being made from mobile device **102** to general purpose computer **104**, such as through a dedicated telephone number. Mobile device interface **106** can answer or monitor the answering of the PSTN modem and determine whether mobile device **102** is calling or whether some other device, such as a fax machine or other computer is calling. Likewise, mobile device interface **106** can operate or monitor a network connection, such as over a local area network, DSL modem, cable modem or other suitable internet or network connections and can determine whether mobile device **102** has transmitted data to general purpose computer **104**. In one exemplary embodiment, mobile device interface **106** can receive addressing data, such as through the use of keypad entries or other data control devices that can transmit network addressed data to general purpose computer **104** at a predetermined network address. Mobile device interface **106** can receive such network addressed data and determine whether it has been transmitted by mobile device **102** or other suitable devices. If it is determined by mobile device interface **106** that mobile device **102** has transmitted data to general purpose computer **104**, mobile device interface **106** establishes a session with mobile device **102** to allow mobile device **102** to interact with general purpose computer **104**.

Audio command interface **108** receives audio commands from mobile device interface **106**. In one exemplary embodiment, audio command interface **108** can receive data from mobile device interface **106** and detect audio commands in the data. For example, mobile device interface **106** may receive data from mobile device **102** without determining whether the data includes audio data, keypad entry data, keyboard entry data, or other suitable data. Likewise, mobile device interface **106** can perform voice recognition and other suitable processing and can provide voice data to audio command interface **108**.

Audio command interface **108** determines whether voice data corresponds to an audio command. In one exemplary embodiment, audio command interface **108** can determine whether voice data corresponds to one of two or more predetermined audio commands. Audio command interface **108** can also execute such detected commands. Audio command interface **108** can also provide a list of available commands to the person using mobile device **102**, such as by presenting prompts to the person, by allowing the person to request a list of available audio commands, or in other suitable manners. Likewise, audio command interface **108** can include one or more states, such that certain audio commands are available depending upon the state of audio



command interface **108**. In this exemplary embodiment, when audio command interface **108** is being used to access and control a native application **112** or operating system interface **110**, audio command interface **108** may change states to provide different audio commands to the person using mobile device **102**.

Operating system interface **110** allows audio command interface **108** to activate various operating system commands. In one exemplary embodiment, audio command interface **108** can include a file of available operating system commands that can be matched with voice data, such as operating system commands that would otherwise be available to a person directly and locally accessing and controlling general purpose computer **104** using a voice command system. For example, an operating system command may include a file search command that can be activated through audio command interface **108** and operating system interface **110**. In this exemplary embodiment, the person using mobile device **102**, after establishing a session with mobile device interface **106**, could state the command "search", and audio command interface **108** could cause the search functionality of operating system interface **110** to be activated. The person could then further identify information to be searched for such as documents, pictures, videos, all files and folders, or other suitable processes can be performed.

Native applications **112** can include one or more native applications accessed and controlled at general purpose computer **104**. In one exemplary embodiment, native applications **112** can be loaded into or interface with audio command interface **108**, such as by installing an applications program interface (API) or other suitable data into audio command interface **108** that identifies native applications **112** and provides available commands for audio command interface **108** to interface with native applications **112**. In this exemplary embodiment, certain predetermined commands for native applications **112** can be provided, such as commands that one person would be authorized to use, whereas commands another person would not be authorized to use can be inhibited or blocked for that person (such as a print command, a command allowing the person to turn off general purpose computer **104**, or other suitable commands).

In operation, system **100** allows a person to use voice commands from mobile device **102** to remotely access and control general purpose computer **104** over communications medium **114**. Unlike prior art systems that require voice command interoperability be provided for each separate native application, system **100** allows mobile device **102** to remotely access and control both operating system functions and native applications at general purpose computer **104**. In this manner, the person using mobile device **102** can see and hear the images and sounds generated at general purpose computer **104**, regardless of the native application or operating system function that is used to generate such images and sounds. As such, each native application **112** or operating system of general purpose computer **104** is not required to be configured to remotely interact with mobile device **102**. Likewise, where native applications at general purpose computer **104** are configured to remotely interact with mobile device **102**, system **100** allows mobile device **102** to switch between native applications that are configured and operating system functions and native applications that are not configured for interaction with mobile device **102**.

FIG. **2** is a diagram of system **200** for providing a mobile device interface in accordance with an exemplary embodiment of the present invention. System **200** includes network interface **202**, native application video output conversion

**204**, and native application audio output conversion **206**, each of which can be implemented in hardware, software, or a suitable combination of hardware and software, which can be one or more software systems operating on a general purpose processing platform.

Network interface **202** provides an interface between general purpose computer **104** and communications medium **114** or other suitable networks. In one exemplary embodiment, network interface **202** can monitor a modem, such as a PSTN modem, cable modem, DSL modem, or other suitable modems for incoming data traffic that indicates that mobile device **102** or other suitable devices are attempting to interface with general purpose computer **104**. Likewise, network interface **202** can monitor a network card, such as a local area network connection, network interface card, or other suitable devices. Network interface **202** receives the incoming mobile device **102** data and performs voice or data recognition on the data.

Native application video output conversion **204** receives native application video output from general purpose computer **104**, such as video data that has been generated by a native application, and converts the video data into a format for transmission to mobile device **102** or other suitable mobile devices. In one exemplary embodiment, native application video output conversion **204** can receive screen information from general purpose computer **104** operating under a native application or operating system command and can convert the screen information into a format for transmission to mobile device **102**. Likewise, native application video output conversion **204** can convert the native application video output into a different format for viewing at mobile device **102**, such as a format that excludes data that would not provide additional functionality, but would otherwise require excessive bandwidth requirements for transfer to mobile device **102**.

Native application audio output conversion **206** receives native application audio output from general purpose computer **104**, such as audio data that has been generated by a native application, and converts the audio data into a format for transmission to mobile device **102** or other suitable mobile devices. Native application audio output conversion **206** is coordinated with native application video output conversion **204**, so as to provide audio output that is correlated with video output, allowing video conferencing, playback of audio-visual data, or other suitable processes. Likewise, native application audio output conversion **206** can convert the native application audio output into a different format for hearing at mobile device **102**, such as a format that excludes data that would not provide additional functionality, but would otherwise require excessive bandwidth requirements for transfer to mobile device **102**.

In operation, system **200** allows a person using mobile device **102** to remotely provide commands to general purpose computer **104** to cause native applications or operating system functions to change state or otherwise perform suitable functions at general purpose computer **104**, while at the same time allowing the person using mobile device **102** to see and hear the images and sounds generated by the native applications or operating system functions at general purpose computer **104**.

FIG. **3** is a diagram of system **300** for providing an audio command interface in accordance with an exemplary embodiment of the present invention. System **300** allows voice commands to be provided to the operating system or native applications operating at general purpose computer **104**.

System **300** includes voice to command conversion **302**, operating system command system **304**, native application command system **306** and functionality limitation system **308**, each of which can be implemented in hardware, software, or a suitable combination of hardware and software, which can be one or more software systems operating on a general purpose processing platform. Voice to command conversion **302** receives voice data and determines whether the voice data matches one or more predetermined commands. In one exemplary embodiment, voice to command conversion **302** can determine if the voice data is in a proper sequence to be received as a command, has occurred at a point in time to be interpreted as a command, and can perform confirmatory functions such as repeating the command to the person or other suitable functions. In one exemplary embodiment, voice to command conversion **302** can include one or more states, such as states based on an operating system function, a native application, or other function being accessed and controlled at a present time. In this exemplary embodiment, when the person using mobile device **102** is accessing and controlling a certain operating system function or native application at general purpose computer **104**, voice to command conversion **302** can limit the number of commands to a predetermined set of commands relevant to the operating system function or native application. Likewise, voice to command conversion **302** can allow the person using mobile device **102** to obtain a list of available commands, such as by stating "list", can allow the person to request confirmation of commands, such as by requesting "confirm," or can perform other suitable functions.

Operating system command system **304** allows a person to use voice commands from mobile device **102** to remotely access and control the operating system at general purpose computer **104**. In one exemplary embodiment, operating system command system **304** can allow the person to perform predetermined operating system commands such as a search command, a run command, a program list command, or other suitable commands. In this exemplary embodiment, the person can speak a command that causes the operating system to generate a display of a predetermined number of last programs that were run by the operating system. Likewise, operating command system **304** can interact with the person, such as allowing the person to obtain a list of available operating system commands, allowing the person to query the operating system to obtain a list of native applications that are available for operation, or in other suitable manners.

Native application command system **306** allows a person to use voice commands from mobile device **102** to remotely access and control the native applications at general purpose computer **104**. In one exemplary embodiment, native application command system **306** can include one or more application programming interfaces having a predetermined set of commands that can be used to operate a native application. In this exemplary embodiment, native application command system **306** can allow the person to request a list of available native application commands, can confirm whether a spoken command received from the person was meant to be one of two or more similar native application commands, or can perform other suitable functions. For example, native application command system **306** can request the person to repeat a command that was not understood, can ask the person to choose between one of two similar commands, can allow the person to navigate backwards a predetermined number of command steps or reset, can provide other suitable functions.

Functionality limitation system **308** interacts with network interface **202** to perform password or other authorization processes, requiring the person using mobile device **102** to be authenticated before being allowed access and control of general purpose computer **104** in whole or in part. In one exemplary embodiment, speech or image data can be received and compared with stored speech or image data. The speech or image data can also include a plurality of sets of speech or image data. In this exemplary embodiment, the speech data can be selected from a set that causes one of a plurality of predetermined processes to be performed, such as a first phrase or term that causes a first native application to be executed, a second phrase or term that causes a second native application to be executed, and so forth. Likewise, certain terms or phrases can be used in public to provide limited functionality to native applications and other terms or phrases can be used in private to provide access and control of additional native applications or functions of such native applications.

In another exemplary embodiment, files of image data showing different authorized persons or authorized persons in different states (such as with long hair, short hair, unkempt hair, with or without facial hair or make-up, or in other states) can also or alternatively be provided; and an image of the person using mobile device **102** can be transmitted from mobile device **102** to general purpose computer **104** to authorize access and control of general purpose computer **104**. The transmitted image data can be compared to the stored image data and it can be determined whether the data matches within a predetermined tolerance, such as by using traditional image data comparison algorithms or processes that identify a plurality of points or features in the facial images for comparison. Combinations of audio and video data can also or alternatively be used for password or other authorization processes and other suitable functions.

In operation, system **300** provides an audio command interface that allows a person to use voice commands from mobile device **102** to access and control native applications or operating system functions at general purpose computer **104**. Audio command interface **108** provides the person with the ability to access and control both native applications that are configured for direct interaction with a mobile device as well as native applications that are not configured for direct interaction with a mobile device, allowing a person to start applications, to switch between applications, to shut down applications, or to perform other suitable functions. System **300** can also limit the access and control the person using mobile device **102** can have of general purpose computer **104**.

FIG. **4** is a diagram of method **400** for using voice commands from a mobile device to remotely access and control a general purpose computer in accordance with an exemplary embodiment of the present invention. Method **400** begins at **402** where a call is received from a mobile device. In one exemplary embodiment, the call can be received over a public switched telephone network, a wireless network, the internet, or other suitable networks. In another exemplary embodiment, the call can be encrypted or coded in other suitable manners. The method then proceeds to **404**.

At **404**, a session is established with the mobile device. In one exemplary embodiment, a session can be established utilizing mobile device identification and confirmation, utilizing a process such as a text password and person ID, a spoken or visual password and person ID where the person using the mobile device transmits audio or image data of themselves, which is confirmed using suitable processes at



the general purpose processor, or in other suitable manners. In another exemplary embodiment, the image of the person using the mobile device can be compared with a plurality of their images using known image comparison processes to determine whether a match exists within a predetermined tolerance, allowing the person using the mobile device to be recognized in different states, such as with long hair, short hair, unkempt hair, with or without facial hair or make-up, or in other suitable states. The method then proceeds to **406**.

At **406**, it is determined whether a voice or data command has been received. If it is determined that a voice or data command has not been received, after a predetermined time, the method then proceeds to **408** where a prompt can be provided to the person using the mobile device to enter a voice or data command, or other suitable processes are performed. In one exemplary embodiment, the prompt can confirm that a session has been established with the mobile device and the general purpose processing platform or other suitable computer, and can allow or provide the person with available voice commands. Likewise, other suitable processes can also or alternatively be performed, such as receipt of data commands entered by a keypad entry or keyboard entry. If it is determined at **406** that a voice or data command has been received, the method then proceeds to **410**.

At **410**, the voice or data command is decoded. In one exemplary embodiment, a voice command can be decoded by determining the equivalent word for a spoken word, whereas a data command can be decoded by determining whether predetermined control data precedes the data that identifies it as a data command such as a key entry or other suitable data. The method then proceeds to **412**.

At **412**, it is determined whether the command is an operating system command. If it is determined that an operating system command has been received, the method then proceeds to **414** where the operating system command is executed. In this exemplary embodiment, an operating system command can be used to generate audio and video output data, such as a command to play a movie file using a video player of the operating system, or other suitable processes. In another exemplary embodiment, the operating system command can include a request to list available operating system commands, such that the operating system command executed at **414** is selected from a list of available operating system commands. In another exemplary embodiment, operating system commands such as "find" or "run" can be utilized in conjunction with spelling commands, such as where the person spells an alphanumeric file identifier or program name. The spelled name can then be repeated back to the person for confirmation, or other suitable processes can be used. In another exemplary embodiment, a document, spreadsheet, photographic image, audio recording, video recording, web page or other suitable data viewer/player can be used to find and view/play a document, spreadsheet, photographic image, audio recording, video recording, web page or other suitable data; and navigation commands such as "back" or "forward" can be used to navigate through a set of files of documents, spreadsheets, photographic images, audio recordings, video recordings, web pages, search results of such data, or other suitable data. The method then proceeds to **422**.

At **422**, the audio output data, video output data, or audio and video output data, generated at the computer is converted to a mobile device format. In one exemplary embodiment, the audio output data and video output data can be converted from a format generated at the general purpose processing platform to a format compatible with the mobile device, such as one having a reduced amount of data, a

reduced number of pixels, reduced definition, reduced audio content, or other suitable formats that are optimized for the mobile device. In another exemplary embodiment, the audio output data and video output data can be converted into a format that excludes data that would not provide additional functionality, but would otherwise require excessive bandwidth requirements for transfer to mobile device **102**. In another exemplary embodiment, the audio output data and video output data can be encrypted or coded in other suitable manners. The method then proceeds to **424**.

At **424**, the audio output data, video output data, or audio and video output data, converted to a mobile device format is transmitted to the mobile device. In one exemplary embodiment, the audio output data and video output data are coordinated with each other, so as to provide audio output that is correlated with video output, allowing video conferencing, playback of audio-visual data, or other suitable processes. In another exemplary embodiment, the audio output data can be transmitted without the video output data being transmitted. In another exemplary embodiment, the video output data can be transmitted without the audio output data being transmitted. In another exemplary embodiment, audio output data and video output data can be converted into a format that allows data transmission to the mobile device in accordance with the bandwidth available at the time of the transmission. The method then proceeds to **426**.

At **426**, it is determined whether a response has been received from the mobile device. If no response has been received, the method proceeds to **428** and terminates. Likewise, the person using the mobile device can be prompted to confirm whether or not they have received the converted audio output data, the converted video output data, or whether they are still active. A "ping" command or other suitable operations can also or alternatively be performed to determine whether a connection still exists with the mobile device. If a response is received at **426**, the method then returns to **406**.

If it is determined at **412** that an operating system command has not been received, the method then proceeds to **416** where it is determined whether a native application command has been received. In one exemplary embodiment, a native application command can include a request to list available native applications, a command to request a list of available native application commands (such as from an API), or other suitable native application commands. If it is determined at **416** that a native application command has been received, the method then proceeds to **418** where the command is executed. The method then proceeds to **422**. Otherwise, if it is determined at **416** that the native application command has not been received, the method proceeds to **420** where an error message is generated. In one exemplary embodiment, the error message can include feedback to the person using the mobile device that the voice or data command received was not recognized as an available operating system or native application command. The method then returns to **406**.

In operation, method **400** allows a person using a mobile device to remotely interact with a computer, whereby the person is able to command the computer from the mobile device and see and hear the images and sounds generated at the computer, in response to the commands received from the mobile device, in a manner similar to what the person would see and hear, if the person were directly and locally interacting with the computer.

Although exemplary embodiments of the system and method of the present invention have been described in detail herein, those skilled in the art will also recognize that various substitutions and modifications can be made to the systems and methods without departing from the scope and spirit of the appended claims.

The invention claimed is:

**1**. A method of accessing and controlling a computer from a mobile device, comprising:

receiving audio data from the mobile device, at the computer, at an audio command interface;

the audio command interface decodes the audio data into a command;

the audio command interface selects, from at least one operating system and at least one application, one operating system or one application, wherein the audio command interface decides is the appropriate operating system or application to execute at least one process in response to the command;

executing with the selected operating system or application the at least one process in response to the command;

generating output data in response to the selected operating system or application executing the at least one process; and

transmitting the output data to the mobile advice.

**2**. The method of claim **1**, wherein the mobile device is not physically connected to the computer and the application selected by the audio command interface is installed on the computer.

**3**. A method of accessing and controlling a computer from a mobile device, comprising:

receiving audio data from the mobile device, at the computer, at an audio command interface;

the audio command interface decodes the audio data into a command;

the audio command interface selects, from two or more applications, one application, wherein the audio command interface decides is the appropriate application to execute at least one process in response to the command;

executing with the selected application the at least one process in response to the command;

generating output data in response to the selected application executing the at least one process; and

transmitting the output data to the mobile device.

**4**. The method of claim **3**, wherein the mobile device is not physically connected to the computer and the application selected by the audio command interface is installed on the computer.

**5**. A system for accessing and controlling a computer from a mobile device, comprising:

a computer;

a communications medium that couples the mobile device to the computer; and

an audio command interface, at the computer, the audio command interface:

receives audio data from the mobile device;

decodes the audio data into a command;

selects, from at least one operating system and at least one application, one operating system or one application, wherein the audio command interface decides is the appropriate operating system or application to execute at least one process in response to the command;

executes with the selected operating system or application the at least one process at the computer in response to the command; and

generates output data in response to the selected operating system or application executing the at least one process;

wherein a mobile device interface at the computer transmits the output data to the mobile device.

**6**. The system of claim **5**, wherein the mobile device is not physically connected to the computer and the application selected by the audio command interface is installed on the computer.

**7**. A system for accessing and controlling a computer from a mobile device, comprising:

a computer;

a communications medium that couples the mobile device to the computer; and

an audio command interface, at the computer, the audio command interface:

receives audio data from the mobile device;



decodes the audio data into a command;

selects, from two or more applications, one application, wherein the audio command interface decides is the appropriate application to execute at least one process in response to the command;

executes with the selected application the at least one process at the computer in response to the command; and

generates output data in response to the selected application executing the at least one process;

wherein a mobile device interface at the computer transmits the output data to the mobile device.

**8**. The system of claim **7**, wherein the mobile device is not physically connected to the computer and the application selected by the audio command interface is installed on the computer.

* * * * *

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 22-2163

**Short Case Caption** Voice Tech Corp. v. Unified Patents, LLC

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(c). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 12/16/2022

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: ______________________

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Debra J. McComas | Haynes and Boone, LLP, 2323 Victory Ave, Ste 700, Dallas, TX 75219, debbie.mccomas@haynesboone.com |
| Raghav Bajaj | Haynes and Boone, LLP, 600 Congress Ave, Ste 1300, Austin, TX 78701, raghav.bajaj@haynesboone.com |
| David L. McCombs | Haynes and Boone, LLP, 2323 Victory Ave, Ste 700, Dallas, TX 75219, david.mccombs@haynesboone.com |
| Angela M. Oliver | Haynes and Boone, LLP, 800 17th St NW, Ste 500, Washington, DC, 20006, angela.oliver@haynesboone.com |
| Roshan Mansinghani | Unified Patents, LLC, 4445 Willard Ave, Ste 600, Chevy Chase, MD 20815, roshan@unifiedpatents.com |

☑ Additional pages attached.

Date: 12/16/2022

Signature: /s/ Eric M. Adams

Name: Eric M. Adams

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 22-2163

**Short Case Caption** Voice Tech Corp. v. Unified Patents, LLC

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(c). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 12/16/2022

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: ____________

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jordan Rossen | Unified Patents, LLC, 4445 Willard Ave, Ste 600, Chevy Chase, MD 20815, jordan@unifiedpatents.com |
| | |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 12/16/2022

Signature: /s/ Eric M. Adams

Name: Eric M. Adams

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-2163

**Short Case Caption:** Voice Tech Corp. v. Unified Patents, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,996 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 12/16/2022

Signature: /s/ Eric M. Adams

Name: Eric M. Adams